# WOODSTOCK IRON COMPANY *v.* RICHMOND AND DANVILLE EXTENSION COMPANY.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE NORTHERN DISTRICT OF ALABAMA.

No. 180. Argued February 1, 1889. — Decided March 5, 1889.

The Richmond and Danville Extension Company contracted with the Georgia Pacific Railway Company to construct that company's road by the nearest, cheapest and most suitable route from Atlanta to Columbus, for a con-

sideration of $20,000 a mile. J., who was a director in and vice-president of the Extension Company, and also a director in the Railway Company, negotiated and concluded on behalf of the Extension Company a contract with an Iron Company that had a large plant and extensive mines at Anniston, by which the Railway Company agreed to deflect its road to Anniston, thereby lengthening it about five miles, and the Iron Company agreed to give a right of way through its property, and to convey to the Extension Company certain tracts of land, valued at $20,000, and to pay to it $30,000 in money. Among the motives for making the contract, urged upon the Iron Company by the Extension Company, was the statement that if it was not entered into, the railroad would be constructed by way of a rival establishment at Oxford, about three miles distant. The Extension Company fully complied with the terms of its contract. The Iron Company failed to comply in part with its undertakings, whereupon this suit was brought. *Held,*

(1) That the contract was void as immoral in conception and corrupting in tendency; it being nothing less than a bribe offered by the Iron Company to the Extension Company to disregard its agreement with the Railway Company to construct the road by the shortest, cheapest and most suitable route;

(2) That the threat to construct the road by the rival town of Oxford did not excuse, much less justify it.

It is the duty of a railroad company towards the public not to impose a burden upon it by unnecessarily lengthening its road; and any agreement by which directors, stockholders or other persons may acquire gain by inducing a company to disregard this duty is illegal, and will not be enforced by the courts.

Agreements upon pecuniary considerations, or the promise of them, to influence the conduct of officers charged with duties affecting the public interest, or with duties of a fiduciary capacity to private parties, are against the policy of the State to secure fidelity in the discharge of all such duties, and are void.

THE case, as stated by the court in its opinion, was as follows:

This case comes from the Circuit Court of the United States for the Northern District of Alabama. The complaint, which was filed in June, 1884, is as follows:

"The plaintiff, which is a corporation created by and under the laws of the State of New Jersey, claims of the defendant, a corporation created by and under the laws of the State of Alabama, and located and having its principal place of business in the county of Calhoun, in the State of Alabama, thirty thousand dollars for the breach of an agreement entered into

by it on, to wit, the 18th day of November, 1881, whereby and wherein said defendant agreed and promised that if said plaintiff would locate and construct, or cause to be located and constructed, the railroad of the Georgia Pacific Railroad Company. (or of the new consolidated company then being formed and to be known as the Georgia Pacific Railway Company) by way of the town of Anniston, it, the said defendant, would donate and pay to the said plaintiff, or as it might direct, the cash sum of thirty thousand dollars, to be paid in money as to one half — that is, fifteen thousand dollars — when the said Georgia Pacific Railroad Company connected its line with the line of the Alabama Great Southern Railroad Company at or above Birmingham, Alabama, and the other half — that is, fifteen thousand dollars — when said line was connected with the line of the Louisville and Nashville Railroad Company (the North and South Alabama Railroad Company) at or above said city of Birmingham, provided said connections be made within three years from date of said contract. And plaintiff avers that it did cause to be located and constructed the railroad of the said Georgia Pacific Railway Company by way of the town of Anniston; that the said Georgia Pacific Railroad Company connected its line with the line of the Alabama Great Southern Railroad Company at or above said Birmingham on, to wit, the 1st day of June, 1883, and with the line of the Louisville and Nashville Railroad Company at or above said city on, to wit, the 1st day of July, 1883; yet although the said plaintiff has complied with all the provisions of said contract on its part, the said defendant has failed to comply with the following provisions thereof, viz.: It has failed and refused and still fails and refuses to pay, though often requested so to do, any part of said sum of thirty thousand dollars, except the sum of six thousand three hundred and twenty-five dollars, whereby it has become and is indebted to said plaintiff as aforesaid; wherefore this suit.

"The said plaintiff claims of the said defendant the further sum of thirty thousand dollars for the breach of an agreement entered into by him on, to wit, the 18th day of November, 1881, in words and figures in substance as follows:

'ANNISTON, CALHOUN CO., ALABAMA,
        '*November* 18*th*, 1881.

'The Woodstock Iron Company makes to the Richmond and Danville Extension Company the proposition following — that is to say:

'First. If the Richmond and Danville Extension Company will locate and construct, or cause to be located and constructed, the railroad of the Georgia Pacific Railroad Company (or of the new consolidated company now being formed, to be known as the Georgia Pacific Railway Company) by way of the town of Anniston, the Woodstock Iron Company will donate and convey, or cause to be donated and conveyed, by good and sufficient deeds, to the Richmond and Danville Extension Company, or as it may direct: 1. Strips or parcels of land each one hundred feet wide — that is to say, fifty feet on each side of the centre line of the location to be fixed for said railroad in, over and through all and sundry the tracts and lots of lands now owned and to be owned by the Woodstock Iron Company, wheresoever situated, on and along the line of said location outside of the corporate limits of the town of Anniston, and the Woodstock Iron Company will, upon request of said Extension Company, at any time, proceed to clear the said strips or parcels of land from timber thereon, allowing, however the said Extension Company to have and take therefrom all that part of timber useful to it for the purpose of construction and for cross-ties.

'2. A strip or parcel of land in, over and through the entire corporate limits of the town of Anniston, so far as owned by the Woodstock Iron Company, as follows — that is to say, on the left or west side of the centre line of the location to be fixed for said railroad, from the point of entering to the point of leaving said corporate limits, a width of fifty feet, measuring from said centre line, and on the right or east side of the centre line of the location to be fixed for said railroad a width of fifty feet, measuring from said centre line from the point of entering said corporate limits to a point nineteen hundred and six and eight-tenths feet short of a point agreed, at or about the near foot of a hillock situated in a field in a west-

erly direction from the depot of the Selma, Rome and Dalton Road; thence for a length of thirteen hundred six and eight-tenths feet to said point agreed a width of one hundred and fifty feet, measuring from said centre line, and thence to a point of leaving said corporate limits a width of fifty feet, measuring from said centre line. Appended hereto is a tracing showing said strip or parcel of land.

'3. All such additional strips or parcels of land within and adjoining the town of Anniston as the experimental location about to be made may show to be reasonably necessary for sidings and other tracks for the advantageous and convenient transaction of the business of the Georgia Pacific Railroad or Railway Company, and especially for siding or spare track along and to the right or east of the Selma, Rome and Dalton line, for convenient approach to the furnaces and for sidings or spare tracks from the main line, at or above the place of greatest width, for convenient approach to the cotton factory; and to the presently to be established car-wheel and car works.

'The Woodstock Iron Company will aid the work of construction, and especially so of the sidings or spare tracks for the furnace, by the judicious wasting of the furnace cinder and other material; and the said company will in a general way do all it can to facilitate the work and advance the business of the railroad company whose location it invites; and the Woodstock Iron Company will donate and pay to the Richmond and Danville Extension Company, or as it may direct, the cash sum of thirty thousand dollars, paying the same in money as to one half — that is, fifteen thousand dollars — when the Georgia Pacific Railroad or Railway Company connects its line with the line of the Alabama Great Southern Railroad Company at or above Birmingham, Alabama; and as to the other half — that is to say, fifteen thousand dollars — when the Georgia Pacific Railroad : Railway Company connects its line with the line of [the] Louisville and Nashville Railroad Company (the North and South Alabama Railroad Company) at or above Birmingham, Alabama, the above to be paid only provided the Georgia Pacific Railroad or Railway Company is so far completed as to make the connections above within three years from this date.

'In case the Richmond and Danville Extension Company accepts the terms proposed above, this instrument shall have the effect of a binding contract upon the Woodstock Iron Company; but such acceptance must be in writing and addressed to the president and secretary and treasurer of the Woodstock Iron Company at Anniston, Alabama, within four months from the date thereof, and, if the Richmond and Danville Extension Company shall desire hereafter to build machine shops for the Georgia Pacific Railroad or Railway Company at the town of Anniston, will donate and convey to said Extension Company, or as it may direct, by good and sufficient deeds for that purpose, at least five acres of land at a convenient distance from the crossing of the Selma, Rome and Dalton Road. If, however, this land is accepted for shops, the land shall be appropriated and the shops built within four years from this date.

'In testimony whereof witness the signature of the president and secretary and treasurer and the corporate seal of the Woodstock Iron Company, this 18th day of November, 1881.

'[SEAL.]                    'ALFRED L. TYLER, *President.*
                            'SAMUEL NOBLE, *Sec'y and Treas.*'

"And the plaintiff avers that it did accept the terms proposed by said instrument above set out, in a writing, addressed to the president and secretary and treasurer of said Woodstock Iron Company, at Anniston, within four months from the date of said agreement and instrument, which said writing was delivered to said president and secretary and treasurer on, to wit, the 18th day of January, 1882, and is in words and figures in substance as follows:

'ATLANTA, GA., *Jan'y 17th*, 1882.
'Messrs. Alfred L. Tyler, President, and Samuel Noble, Secretary and Treasurer of Woodstock Iron Company, Anniston, Ala.

'GENTLEMEN: The Richmond and Danville Extension Company hereby notifies you that it accepts the proposition in writing made by you on behalf of the Woodstock Iron Com-

pany to said Extension Company regarding the location and construction of the Georgia Pacific Railway by the town of Anniston, the date whereof is Anniston, Calhoun County, Alabama, November 18th, 1881, and a copy of which is hereto appended.             Respectfully,

'JOHN W. JOHNSTON,
'*Vice-President Richmond and Danville Extension Company.*'

"And plaintiff avers that said defendant was at that time engaged, among other things, in the business of making pig-metal and other products from iron ores, and making sales of the same; that its works were located in said town of Anniston, and that it owned large quantities of valuable property therein, and that the said railroad referred to in said contract was a road, then in the process of construction, to be run from Atlanta, Georgia, through the State of Alabama to Columbus, in the State of Mississippi; and plaintiff avers that it did locate and construct the railroad of the said Georgia Pacific Railway Company by way of the town of Anniston, by, to wit, the 1st day of January, 1883; that it did connect the line of said railway company with the line of the Alabama Great Southern Railroad Company, at or above said city of Birmingham, by, to wit, the 1st day of June, 1883; and that it did connect the line of said railway company with the line of the Louisville and Nashville Railroad Company, at or above the said city of Birmingham, by, to wit, the 1st day of July, 1883; and has in all things fully complied with all the terms and stipulations of said agreement undertaken upon its part. Plaintiff further avers that said defendant has complied with the terms and stipulations of said agreement to this extent, and no further. It has donated and conveyed by good and sufficient deeds to the Georgia Pacific Railway Company, as directed and requested by the plaintiff, the several strips and parcels of land for right of way and sidings of the railroad of said company, as stipulated and agreed in said agreement, and has paid to the said plaintiff on account of said cash payment of thirty thousand dollars agreed and undertaken to be made

by said agreement the sum of six thousand three hundred and twenty-five dollars, paid in cars furnished and advanced by defendant to the Georgia Pacific Railroad Company, on account of said cash payment, at the request of plaintiff. But plaintiff further avers that although it has fully complied with all the terms and stipulations of said agreement to be done and performed on its part, that although it located and constructed said railroad of the Georgia Pacific Railway Company by the way of the town of Anniston and connected the line of said railroad with the respective lines of the Alabama Great Southern Railroad Company and the Louisville and Nashville Railroad Company within the time and at the points agreed on, as is hereinabove fully set out and shown, the defendant has wholly failed and refused, and still fails and refuses, although often requested to do so, to pay to said plaintiff said sum of twenty-three thousand six hundred and seventy-five dollars, the balance due and unpaid upon said cash sum of thirty thousand dollars donated and agreed to be paid to plaintiff by said defendant upon the making of said connections as aforesaid, and by reason of the several matters and things set out and alleged herein the said defendant became, and is, indebted to the plaintiff in said sum of twenty-three thousand six hundred and seventy-five dollars, with interest thereon from date of the making of such connections, but has failed and refused, and still fails and refuses, to pay the same: wherefore this suit."

To the complaint the defendant filed a demurrer and also several pleas. The demurrer was to the effect that the contract set forth as the foundation of the action was without consideration and was contrary to public policy and void. The demurrer was overruled, and leave given to the defendant to file additional pleas. The original pleas were five in number, and to these six more were added. Of the original pleas one amounted to the general issue, denying the promise and undertaking in the manner and form alleged in the complaint; and one amounted to a plea of *ultra vires*, setting forth the charter of the defendant, showing the object of its incorporation to be the manufacture of pig-metal and other products of iron ore, and their sale, connecting with that business all

such operations as are usual and incidental thereto, and denying authority, under the charter, to make the agreement mentioned in the complaint. A demurrer to this last plea was sustained by the court.

Of the additional pleas two only require notice — the 10th and 11th. The 10th plea is given in full below, and so much of the 11th plea as is necessary to its comprehension.

"Plea 10. And the said defendant, for further answer to the complaint, says that at the time of the making of the alleged agreement stated and set forth in the complaint, plaintiff was engaged in locating and constructing the Georgia Pacific Railroad under a contract with the Georgia Pacific Railroad Company, under and by which plaintiff agreed with said Georgia Pacific Railroad Company to locate and construct said railroad by the nearest, cheapest and most suitable route, from Atlanta, Georgia, through Alabama to Columbus, in the State of Mississippi, for a consideration to wit, twenty thousand dollars per mile for each and every mile of said road so located and constructed.

"That John W. Johnston, who negotiated and executed said contract with the defendant for plaintiff as vice-president, was, at the time said agreement was made, a stockholder and director of the Richmond and Danville Extension Company, and was also a stockholder and director and officer of the Georgia Pacific Railroad Company; that the Georgia Pacific Railroad Company was at said time, and is now, a separate and distinct company, and in nowise connected with plaintiff, except that some of the stockholders of said Georgia Pacific Railway Company, were also stockholders in said Richmond and Danville Extension Company, and plaintiff was locating and constructing said road under its contract with said company as aforesaid.

"That in causing said road to be built *via* Anniston it was necessary to deflect the same from its nearest, cheapest and most natural route from Atlanta to Columbus a great number of miles, to wit, five miles, at a great additional cost to said Georgia Pacific Railroad Company, to wit, one hundred thousand dollars, and defendant avers that said alleged agreement

on defendant's part to influence the location of said railroad and to donate and pay to said plaintiff, among other things, the cash sum of thirty thousand dollars if plaintiff would locate and construct, or cause to be located and constructed, the railroad of the Georgia Pacific Railroad Company by way of the town of Anniston, was and is contrary to public policy and void, and ought not to be enforced against defendant or in favor of plaintiff."

Plea No. 11, after repeating the first paragraph of plea No. 10, alleges "that John W. Johnston, who negotiated and executed said contract with defendant for plaintiff as vice-president, was, at the time a stockholder, director and officer of the Georgia Pacific Railway Company; and that he went to Anniston where defendant resided and did business, and represented to defendant that he was a director and officer of the Georgia Pacific Railway Company, and also a stockholder, director and officer of the Richmond and Danville Extension Company, and could control and induce the location and construction of said Georgia Pacific Railroad *via* the town of Anniston, and would do so if the defendant would donate and pay to plaintiff the said sum of thirty thousand dollars in cash, and deed to plaintiff, or as it might direct, the large quantity of real estate described in the complaint, which defendant avers was of value, to wit, twenty thousand dollars, and that said Johnston then and there informed the defendant that unless defendant acceded to his said demand to pay plaintiff said sum of money, and convey to plaintiff, or as it might direct, the large quantity of valuable real estate aforesaid, said road would not be constructed by the town of Anniston, but would be constructed by way of the town of Oxford, which said town is within three miles of the town of Anniston, and is a rival market to said town of Anniston, and thence direct to Birmingham, along the line of a preliminary survey already made; and to secure the location and construction of said road *via* the said town of Anniston, and to prevent the locating and building of said road by way of the rival town of Oxford, to the exclusion of the town of Anniston, defendant was forced to agree, and did agree, to pay the said sum

of thirty thousand dollars in cash, and to convey to plaintiff, or as it might direct, the large quantity of valuable lands described in the complaint, as aforesaid."

To these pleas a demurrer was filed by the plaintiff and sustained by the court. The case was then tried upon the general issue by a jury, which rendered a verdict in favor of the plaintiff, assessing its damages at $27,067.42, upon which judgment was entered with costs, to review which the case is brought here on writ of error.

*Mr. John B. Knox,* for plaintiff in error, on the point on which the opinion turns, cited: *Fuller* v. *Dame,* 18 Pick. 472; *Holladay* v. *Patterson,* 5 Oregon, 177; *Pacific Railroad Company* v. *Seely,* 45 Missouri, 212; *S. C.* 100 Am. Dec. 369; *Bestor* v. *Wathen,* 60 Illinois, 138; *Linder* v. *Carpenter,* 62 Illinois, 309; *Marsh* v. *Fairburg &c. Railroad Co.,* 64 Illinois, 414; *St. Louis &c. Railroad Co.* v. *Mathers,* 71 Illinois, 592; *Dudley* v. *Cilley,* 5 N. H. 558; *Dudley* v. *Butler,* 10 N. H. 281; *Davison* v. *Seymour,* 1 Bosworth, 88; *Cook* v. *Sherman,* 4 McCrary, 20; *Western Union Tel. Co.* v. *Union Pacific Railroad,* 3 Fed. Rep. 1; *Elkhart County* v. *Crary,* 98 Indiana, 238; *Noel* v. *Drake,* 28 Kansas, 265; *Byrd* v. *Hughes,* 84 Illinois, 174; *Smith* v. *Applegate,* 23 N. J. Law (3 Zabr.) 352; *Callagan* v. *Hallett,* 1 Caines, 103; *Providence Tool Co.* v. *Norris,* 2 Wall. 45; *Wardell* v. *Union Pacific Railroad,* 103 U. S. 651; *Koehler* v. *Hubby,* 2 Black, 715.

*Mr. H. C. Tompkins,* for defendant in error, cited: *Rives* v. *Missouri &c. Railroad,* 30 Alabama, 92; *Wilks* v. *Georgia Pacific Railway,* 79 Alabama, 180; *Cedar Rapids and St. Paul Railroad* v. *Spafford,* 41 Iowa, 292; *McClure* v. *Missouri River &c. Railroad,* 9 Kansas, 373; *Chicago and Atlantic Railway* v. *Derkes,* 103 Indiana, 520; *Spartanburg &c. Railroad* v. *DeGraffenried,* 12 Richardson (Law) 675; *S. C.* 78 Am. Dec. 476; *McMillan* v. *Maysville &c. Railroad,* 15 B. Mon. 218; *S. C.* 61 Am. Dec. 181; *Rhey* v. *Ebensburg &c. Plank Road Co.,* 27 Penn. St. 261; *Jewett* v. *Lawrenceburg &c. Railroad,* 10 Indiana, 539; *Martin* v. *Pensacola &c. Railroad,* 8 Florida, 370; *S. C.* 73 Am. Dec. 713; *Taggart* v.

*Western Maryland Railroad*, 24 Maryland, 563, 581, 582 *S. C.* 89 Am. Dec. 760; *Des Moines Valley Railroad* v. *Graff*, 27 Iowa, 99; *First National Bank* v. *Hurford*, 29 Iowa, 579; *Detroit &c. Railroad* v. *Starnes*, 38 Michigan, 698; *Buckspor' &c. Railroad* v. *Brewer*, 67 Maine, 295; *International &c. Railroad* v. *Dawson*, 62 Texas, 260; *Chapman* v. *Mud Riv'r &c. Railroad*, 6 Ohio St. 119; *Pixley* v. *Gould*, 13 Bradwell (Ill.) 565; *Twin-Lick Oil Co.* v. *Marbury*, 91 U. S. 587; *Thomas* v. *Brownsville Railroad*, 109 U. S. 522; *Pneumatic Gas Co.* v. *Berry*, 113 U. S. 322; *Union Pacific Railroad* v. *Crédit Mobilier*, 135 Mass. 367; *Kitchen* v. *St. Louis &c. Railroad*, 69 Missouri, 224; *Ashurst's Appeal*, 60 Penn. St. 290; *European &c. Railway* v. *Poor*, 59 Maine, 277.

Mr. JUSTICE FIELD, after stating the case, delivered the opinion of the court.

As appears from the pleadings, which are set forth in the above statement, some time previous to November, 1881, the plaintiff below, the Richmond and Danville Extension Company, a corporation created under the laws of New Jersey, entered into a contract with the Georgia Pacific Railway Company, a corporation created under the laws of Georgia, to locate and construct for the latter company, by the nearest, cheapest and most suitable route, a railroad from Atlanta in Georgia through Alabama to Columbus in Mississippi, at the rate of $20,000 a mile, to be paid in whole or part in the bonds of the railroad company; and in November, 1881, it was engaged in locating and constructing the road under the contract. At that time the defendant below, the Woodstock Iron Company, a corporation created under the laws of Alabama for the manufacture and sale of products of iron ore, was doing business at the town of Anniston in that State; and it then made a formal proposition in writing to the Extension Company that if it would locate and construct, or cause to be located and constructed, the railroad by way of the town of Anniston, then the Iron Company would donate and convey, or cause to be donated and conveyed, to the Extension Company sundry parcels of land both within and without the corporate limits of

the town, for the location of the road, and which might be necessary for sidings or spare tracks; and would also donate and pay to the Extension Company $30,000, one half when the road made a connection with the line of the Alabama Great Southern Railroad Company at Birmingham, Alabama, and the other half when the road made a connection with the line of the Louisville and Nashville Railroad Company at that place; the payments to be made provided the road should be so far completed as to make the connections designated within three years. The proposition was formally accepted in writing by the Extension Company, through its vice-president, John W. Johnston.

Pursuant to this contract the Extension Company located and constructed the railroad by way of the town of Anniston by the first of January, 1883, and made the connections speci-fied, within the period designated, and complied in every respect with its terms.

The Woodstock Iron Company complied with the contract only in part. At the request of the Extension Company it conveyed to the railroad company the several parcels of land mentioned, and also upon like request furnished it with cars to the value of $6325. For the balance, amounting to $23,675, the present suit was brought, and the principal question presented to the court below, and to this court, is whether the contract is obligatory upon the defendant, or whether it is void as being against public policy.

In determining this question, it must be borne in mind that the contract of the Extension Company with the Georgia Pacific Railway Company was to locate and construct the road "by the nearest, cheapest and most suitable route from Atlanta, Georgia, through Alabama to Columbus in Missis-sippi," for the consideration of $20,000 a mile, and that it is averred in the pleadings and admitted by the demurrer, that in causing the road to be located by way of Anniston, it was necessary to deflect the same from the nearest and cheapest and most natural route between the designated termini, a dis-tance of five miles, at an additional cost of $100,000. In the light of these facts there can be but one answer given to the

question presented respecting the contract between the Iron Company and the Extension Company, namely, that it was a void contract, immoral in its conception and corrupting in its tendency. It was a contract by an employé of a railroad company with a third party, for a consideration to be received from that third party, to violate its engagement with its employer in the important business of locating and constructing a railroad, and instead of selecting the shortest, cheapest and most suitable route, to locate the road by a longer route, and thus impose an unnecessary and heavy burden upon its employer. The proposition of the Iron Company, which was accepted, was to pay the Extension Company for a breach of its duty. In plain language, it was nothing less than the offer of a bribe to the latter company to be faithless to its engagements, and to do with reference to the business in which it was engaged what would amount to little less than robbery of its employer. The transaction on the part of the Iron Company was none the less offensive, because of the threats of the Extension Company, made by its vice-president, who was also a director and stockholder of the railroad company, that, if the land and money mentioned were not donated, it would cause the road to be located away from Anniston by the rival town of Oxford. The threats did not excuse, much less justify, the offer.

We have thus far considered the case as one only between private parties, where an employé has agreed, for a money consideration, to violate his obligation to his employer; but there are other circumstances which add to the offensiveness of the transaction. The business of the Extension Company was one in which the public was interested. Railroads are for many purposes public highways. They are constructed for the convenience of the public in the transportation of persons and property. In their construction without unnecessary length between designated points, in their having proper accommodations, and in their charges for transportation, the public is directly interested. Corporations, it is true, formed for their construction are private corporations, but whilst their directors are required to look to the interests of their stock-

holders, they must do so in subordination to and in connection with the public interests, which they are equally bound to respect and subserve. All arrangements, therefore, by which directors or stockholders or other persons may acquire gain, by inducing those corporations to disregard their duties to the public are illegal and lead to unfair dealing, and thus being against public policy will not be enforced by the courts. In this case the Extension Company, to which the duty of locating and constructing the railroad between its termini was entrusted, in agreeing, for a consideration offered by a third party, to disregard that duty and locate and construct the road by a longer route than was required, not only committed a wrong upon the railroad company by thus imposing unnecessary burdens upon it, to meet which larger charges for transportation might be called for, but also a wrong upon the public.

The case of *Fuller* v. *Dame*, 18 Pick. 472, 483, is instructive on this head. It there appeared that Dame, the defendant, was the owner of a large tract of land and flats situated on Sea Street, and between it and Front Street, on the south side of Boston, which would be greatly enhanced in value if the Boston and Worcester Railroad Company would locate one of its depots between those streets and easterly of Front Street. To induce the company to make such location it was supposed to be necessary to form an association, which would pay to it a large sum of money and furnish a large tract of land for the depot, besides making other donations; and to provide the money and land, also to form a company to purchase the flats and land between the streets named, to be held as joint stock and laid out in due form and shape for sale. Fuller agreed to aid Dame in getting up such company, and in inducing the railroad company to fix its termination and principal depot between those streets, Fuller being himself of opinion that the railroad ought, from a view of the public good and the good of its stockholders, to enter the city on the southerly side and have its principal depot there. In consideration of such agreement Dame gave his note for $9600, payable to Fuller in three years, the note being deposited with third parties, to be de-

livered to him when the principal depot of the railroad company for merchandise was constructed between the streets mentioned. Fuller was at the time of the agreement a stockholder in the railroad company. The road having been completed, and the principal depot located between the streets mentioned, and the note not being paid, suit was brought upon it. It was adjudged that the contract was contrary to public policy, and that the note given in consideration of it was therefore void. In coming to this conclusion the court considered somewhat at large the ground upon which contracts of this character were avoided, and held that it was because they tended to place one under wrong influences, by offering him a temptation to do that which might injuriously affect the rights and interests of third persons, and that the case before it was within the operation of this principle, the contract tending injuriously to affect the public interest in establishing the fittest and most suitable location for the termination of the Boston and Worcester Railroad for the accommodation of the public travel. It is true the road was constructed and located by the corporation at the expense of private parties under the sanction of the legislature, incorporated for that purpose, who were to be remunerated by a toll levied and regulated by law; and it was left to its directors to fix the termination and place of deposit. But the court added: "In doing this a confidence was reposed in them, acting as agents for the public, a confidence which, it seems, could be safely so reposed, when it is considered that the interests of the corporation as a company of passenger and freight carriers for profit was identical with the interests of those who were to be carried, and had goods to be carried, that is with the public interest. This confidence, however, could only be safely so reposed under the belief that all the directors and members of the company should exercise their best and their unbiased judgment upon the question of such fitness, without being influenced by distinct and extraneous interests, having no connection with the accommodation of the public or the interests of the company. Any attempt, therefore, to create and bring into efficient operation such undue influence has all the injurious effects of

a fraud upon the public, by causing a question which ought to be decided with a sole and single regard to public interests, to be affected and controlled by considerations having no regard to such interests. It is no answer to say that, by the act of incorporation, the executive authority was vested in a board of directors, and Mr. Fuller was not a director. He was a member of the company and might be chosen a director. He was an elector of the directors, and they were directly responsible to the stockholders. The immediate act of location was with directors, but the efficient authority was with the members and stockholders of the corporation, who elect the directors. The election may depend upon the known views and opinions of candidates upon this very question of location. They had a right to his disinterested judgment and advice upon the question of location; and this could not be exercised whilst he held and relied on a promise for a large sum of money, the payment of which depended upon this decision of the question by the directors."

The case before us is much stronger than the one thus decided by the Supreme Judicial Court of Massachusetts. There the contract was held invalid because made with a stockholder of the company, by which he promised, for a pecuniary consideration, to endeavor to procure the company to locate one of its depots at a particular place in the city. Here the contract was with an employé of the company to induce it to disregard its obligations, and the principal person making that contract on the part of the employé was a director and stockholder of the company which was to be thus seriously affected.

The principle, which is so clearly and forcibly stated in *Fuller* v. *Dame*, has been applied in numerous instances by the highest courts of different States, to avoid contracts made to influence railroad companies in selecting their routes, and locating their depots and stations, by donations of land and money to some of its directors or stockholders or agents. Thus, in *Bestor* v. *Wathen*, 60 Illinois, 138, it appeared that in 1849 the legislature of Illinois incorporated a company to build a railroad from a point on the Mississippi River to Peoria, and that in 1852 the charter was amended so as to authorize the extension

of the road from Peoria eastward to the state line. In 1855 the company made a contract with the firm of Cruger, Secor & Company, by which the latter undertook. the construction and equipment of the road. In 1856, whilst engaged upon this work, the members of the firm, together with Bestor, the president of the railroad company, Sweat, one of its directors, and Smith, its construction agent, entered into a contract with Wathen and Gibson, the defendants, by which the latter, being the owners of 160 acres of land, agreed, in consideration that the road then in process of construction should cross the Illinois Central Railroad where their land was situated, the land would be laid out into town lots and sold, and after proceeds amounting to $4800 had been received, which were to be retained by Wathen and Gibson, a conveyance of an undivided half of the residue should be made to the other parties. The only consideration for this agreement, aside from the location of the road, was that the other parties should assist and contribute to the building up of the town on the land. The road was constructed across the Illinois Central, and Wathen and Gibson laid out the land into lots and proceeded to sell the same, and the town of El Paso was built on the land and an adjoining tract. In 1863 the plaintiffs filed their bill against Wathen and Gibson for an account of the sales and a conveyance of the undivided half of the lots unsold. The court held the contract void as against public policy, and dismissed the suit, and the decree in this respect was affirmed by the Supreme Court of the State, that court observing that when the people through their legislature grants to a company the right of eminent domain for the purpose of constructing a railroad it is upon the supposition that the road will bring certain benefits to the public, and that when subscriptions are made to its stock, the money is subscribed upon the understanding that the officers, entrusted with the construction of the road, will so locate its line and establish its depots as to bring the highest pecuniary profit to the stockholders compatible with a proper regard for public convenience; that these alone are the considerations which should control officers of the road, and so far as they permit their official action to be swayed by

their private interests they are guilty of a breach of trust towards the stockholders, and a breach of duty to the public at large; and it added: "A court of equity will not enforce a contract resting upon such official delinquency or even tending to produce it. Such is the character of the contract before us. If we enforce it we lend the sanction of the court to a class of contracts, the inevitable tendency of which is to make the officers of these powerful corporations pervert their trust to their private gain, at the price of injury at once to the stockholders and to the public. Rendered into plain English, the contract in this case was a bribe on the part of Wathen and Gibson to the president and other officers of the railway company, and to the contractors who were building the road, of an undivided half of one hundred and sixty acres of land, in consideration of which the road was to be constructed on a certain line and a depot built at a certain point. Now if this was the best line for crossing the Illinois Central considered with reference to the interest of the stockholders and of the public, then it was the duty of the officers of the company to establish it there; and if they intended so to do because it was the proper line, but professed to be hesitating between this and another line in order to secure to themselves the contract under consideration, as is somewhat indicated by the evidence, then they were practising a species of fraud upon the defendants, and using a false pretext in order to acquire defendants' property without consideration. If on the other hand this line was not the best, but was adopted because of this contract, the case is still stronger against the complainants. If such was the fact they are asking the court to enforce the payment of a bribe, the promise of which induced them to sacrifice their official duty to their private gain. If, as a third contingency, the choice lay between this line and another equally good, but not better, and they were influenced by this contract to adopt this line, then, although neither the company nor the public has been injured, yet the defendants have made their official power an instrument of private emolument in a manner which no court of equity can sanction. In this particular case no wrong may have been done, and yet public policy plainly forbids the sanc-

tion of such contracts because of the great temptation they would offer to official faithlessness and corruption." The doctrine of this case was approved by the Supreme Court of Illinois in *Linder* v. *Carpenter*, 62 Illinois, 309, and in *St. Louis, Jacksonville and Chicago Railroad* v. *Mathers*, 71 Illinois, 592.

*Holladay* v. *Patterson*, decided by the Supreme Court of Oregon, 5 Oregon, 107, is also in harmony with *Fuller* v. *Dame* and *Bestor* v. *Wathen*, the court following a similar course of reasoning to that adopted in those cases. That doctrine and reasoning are also often applied where the reward or money consideration for taking a particular route or establishing a station or depot at a particular place is offered directly to the railroad company instead of to its directors, stockholders, or agents. But we do not refer to them, because there are exceptions or qualifications in the application of the doctrine in such cases requiring explanation, as where a subscription is conditioned upon the adoption of a particular route, or the construction of a station or depot at a particular place. *Pacific Railroad Co.* v. *Seely*, 45 Missouri, 212; *Racine County Bank* v. *Ayers*, 12 Wisconsin, 512 (Vilas and Bryant's ed. 570); *Fort Edward and Fort Miller Plank Road Co.* v. *Payne*, 15 N. Y. 583. There is no exception in any decision called to our attention as to the character of a contract when for a pecuniary consideration directors, stockholders, or agents of a company undertake to influence its conduct in these matters. Indeed, the law is general that agreements upon pecuniary considerations, or the promise of them, to influence the conduct of officers charged with duties affecting the public interest, or with duties of a fiduciary character to private parties, are against the true policy of the State, which is to secure fidelity in the discharge of all such duties. Agreements of that character introduce mercenary considerations to control the conduct of parties, instead of considerations arising from the nature of their duties and the most efficient way of discharging them. They are, therefore, necessarily corrupt in their tendencies. As we said in *Tool Company* v. *Norris*, 2 Wall. 48, 56, "that all agreements for pecuniary considerations

to control the business operations of the government, or the regular administration of justice, or the appointments to public offices, or the ordinary course of legislation, are void as against public policy, without reference to the question whether improper means are contemplated or used in their execution," so we say of agreements like the one in this case; they are against public policy because of their corrupt tendency, whether lawful or unlawful means are contemplated or used in carrying them into execution. "The law," as said in that case, "looks to the general tendency of such agreements; and it closes the door to temptation by refusing them recognition in any of the courts of the country." *Oscanyan* v. *Arms Co.*, 103 U. S. 261. 274.

From the views expressed it follows that the court below erred in sustaining the demurrers to the special pleas above mentioned, and it is not necessary, therefore, to consider the other pleas. The judgment must be

*Reversed and the cause remanded with instructions to overrule the demurrers to the above pleas, and take further proceedings not inconsistent with this opinion.*

Mr. Justice Miller and Mr. Justice Bradley dissented.