Robert B. **TROUTMAN**, Jr.

v.

**SOUTHERN RAILWAY COMPANY.**

Civ. A. No. 11210.

United States District Court
N. D. Georgia,
Atlanta Division.

Dec. 20, 1968.

Troutman, Sams, Schroder & Locker-man, Atlanta, Ga., for plaintiff.

Charles J. Bloch and Ellsworth Hall, Jr., Macon, Ga., Eugene T. Branch and Earle B. May, Jr., Jones, Bird & Howell, Atlanta, Ga., for defendant.

## ORDER

EDENFIELD, District Judge.

In this action, which seeks to recover monies allegedly due for services rendered, the defendant, Southern Railway, has filed a motion for summary judgment.

The action is brought by an attorney at law on two separate transactions. The first may be referred to as the "Central of Georgia matter", and the second as the "grain rate matter". The complaint makes no breakdown as to the amount claimed for each transaction. Both are for services rendered, however, in one instance for work before the Interstate Commerce Commission (in the Central of Georgia matter) and in the other before the President of the United States and the United States Department of Justice (in the grain rate matter).

The defendant's motion for summary judgment is based on a claim that the contracts made and the services rendered, under the undisputed facts, were in furtherance of a scheme to influence the conduct of public officials and contrary to public policy so that compensation therefor cannot be recovered in the courts. As to the Central of Georgia transaction, the defendant also moves for summary judgment on the further ground that the claim is barred by the four-year statute of limitations contained in Georgia Code § 3–711.

■ In finding the facts, the court has relied exclusively upon statements made by the plaintiff himself either in an affidavit filed by him or in letters admittedly written by him. Perhaps this is a unique approach, for normally, of course, an opposing affidavit does not aid a movant in summary judgment. The courts recognize, however, that he should have any support it affords (Dixon v. A. T. & T. Co., 159 F.2d 863 (2d Cir., 1947); Chan Wing Cheung v. Hamilton, 198 F.Supp. 154 (D.R.I., 1961), aff'd 298 F.2d 459 (1st Cir., 1962)), and

under the peculiar facts here, the court concludes that unless the plaintiff's own version of the transaction shows he cannot recover, the motion for summary judgment must be denied.

Having made this preliminary statement, the court finds the facts to be as follows:

During and prior to 1962 plaintiff, a licensed attorney at law in the City of Atlanta, was interested, through a corporation controlled by him, in certain "air rights" above the tracks of the Western & Atlantic Railroad in downtown Atlanta. The defendant Southern Railway was the owner of certain similar rights over its tracks in downtown Atlanta and adjacent to those owned or controlled by the plaintiff. The plaintiff was very much interested in developing these rights and also was desirous of entering into a joint venture of some character with the defendant whereby the adjacent air rights would be developed as part of a single undertaking.

Some time prior to 1962 the defendant Southern Railway had filed an application with the Interstate Commerce Commission for permission to purchase the Central of Georgia Railroad for a price of some $30,000,000. Similar approval had already been obtained from the Georgia Public Service Commission, but action by the ICC had not been forthcoming, although the application had been pending before that body for some two years.

In October of 1962 a vice president (and the assistant to the president) of the defendant, a Mr. Sim Wilbanks, came to see the plaintiff about the critically long delay by the ICC in passing upon the Central of Georgia purchase by defendant. Wilbanks asked plaintiff if he could "help Southern Railway expedite action by the ICC." The plaintiff indicated that he would be willing to help if he could and mentioned to Wilbanks that he, plaintiff, had already been talking with the president of defendant (Brosnan) about a joint development of the air rights project. On October 21, 1962, plaintiff went to work in an effort to

help the Southern expedite action with respect to its acquisition of the Central of Georgia. He first discussed the matter with the Georgia Public Service Commission. Thereafter, he went to Washington and met with Commissioners Murphy and Tucker of the ICC "to determine why action had not been taken. * * *" On October 29, 1962 he again conferred with Commissioners Murphy Tucker and presented "facts which I had obtained as to the urgency of the matter." (Troutman affidavit, pp. 2, 3.)

Largely through his efforts, as plaintiff contends, the ICC on November 8, 1962 approved Southern's application for acquisition of. the Central of Georgia "subject to the Commission being assured of Southern's ability to obtain the necessary funds on reasonable terms. * * *" (Troutman affidavit, p. 3.)

To continue with plaintiff's affdavit, he says that:

"Several days later Mr. Wilbanks came to my office and discussed Southerns obligation to me for my services in the Central of Georgia case. I told Mr. Wilbanks that Southern could settle its account with me for my services in that matter by entering into an arrangement for joint development of the air rights properties. Mr. Wilbanks approved that method of settlement and stated that he would go to work on the matter with the proper officials of his company and that I could expect early attention from them." (Troutman affidavit, p. 4.)

Several months then passed with no further contact between the parties and, so far as appears, no further work was ever done by plaintiff with respect to the Central of Georgia transaction, and apparently none was required or expected.

Thereafter, on July 2, 1963, Wilbanks telephoned the plaintiff, saying he wanted to see him and would come to Atlanta. He came about two weeks later and stated that he very much needed plaintiff's help again and upon another matter, whereupon plaintiff says:

"I told Mr. Wilbanks that I was quite displeased over Southern's non-

action in going forward with us in the air rights undertaking and that therefore I was not interested in again helping Southern with another one of its problems." (Troutman affidavit, p. 5.)

Wilbanks then recounted to plaintiff what Southern's new problem was. To summarize, he stated that Southern had undertaken a project for hauling grain from the Midwest into the South in multiple carload lots, and that in anticipation of a large volume of traffic, it had not only reduced its rates on grain by 60%, but had also purchased many millions of dollars of "Big John" cars for the purpose of hauling the grain. He recounted further that on July 15th, after these commitments were made, Southern had been served with an order by the ICC cancelling Southern's reduction in grain rates effective as of August 26, 1963, thereby jeopardizing the whole program, including Southern's investment. Wilbanks urged to plaintiff that the ICC action was strongly contrary to the public interest, particularly in the Southeast, and was in violation of law. He also told plaintiff that the Southern had filed suit in federal court in Cincinnati, Ohio to have the cancellation order of the ICC set aside. Mr. Wilbanks then stated to plaintiff that:

"Southern Railway wanted the facts in this case brought to the attention of President Kennedy and that they (Southern) wanted to persuade the United States Department of Justice as to the legal merits of Southern Railway's position in the case so as to persuade the Department not to support the position of the ICC in the matter but instead to support Southern Railway's position." (Troutman affidavit, p. 6.)

Plaintiff thereupon asked Mr. Wilbanks

" * * * what he wanted me to do and he said he wanted me to discuss the matter with President Kennedy because of the public interest phase of the case and to seek the President's interest in the matter and to try to get the Department of Justice on Southern's side of the controversy,"

pointing out that the cancellation order, if effective, would cost the livestock and poultry interests in the South millions of dollars per year.

Plaintiff then told Wilbanks that despite his displeasure with Southern's failure to cooperate in the air rights matter, he would help in the grain rate matter if convinced as to the merits of Southern's position. He also asked Wilbanks to furnish him with a statement of Southern's position, and a statement thereof was sent to him by Wilbanks on July 26th. Plaintiff says he told Wilbanks he would help "because it seemed to me that Southern's position had merit." The material sent by Wilbanks included the suit papers filed in the Cincinnati case and a legal memorandum setting out why the order was contrary to law and to the public interest, in Southern's opinion. It also made a contention that the order was contrary to President Kennedy's message to Congress in connection with the National Transportation policy. (Troutman affidavit, pp. 7–8.)

Plaintiff then recounts the research which he did in acquainting himself with the matter, and then says in his affidavit that because of Southern Railway's contentions, "I had no question as to the propriety of bringing the matter to the attention of President Kennedy, whom I had known for a number of years." (Troutman affidavit, p. 8.)

Thereupon, plaintiff made an appointment with President Kennedy, and with respect to what transpired, his affidavit says:

"I * * * explained to him Southern Railway's rate reduction problem with the ICC and its lawsuit against the Commission and the United States. I pointed out to him the discriminatory aspects of the ICC's action and the potential benefit of reduced grain rates. * * * *"

He says the President asked numerous questions, some of which plaintiff could answer and some of which he could not. He says, "The President then stated that he had not previously known of the problem but thought the idea of the Justice Department opposing the ICC was rather unusual." He says the President told him, however, that he would look into the matter and thereupon called a Presidential Assistant, a Mr. Feldman, of his staff. (Troutman affidavit, p. 9.)

After further research by the plaintiff, he returned to Washington and again met with the President, who stated to plaintiff:

"That his legal staff had reported to him that in their opinion the ICC's ruling in the 'Big John' case was atrocious."

Plaintiff continues, that:

"The President stated that his staff would now discuss the matter with the Justice Department staff, and he asked me not to begin discussion of the matter with the Justice Department until after their discussions had been undertaken."

The President also wanted to know the views and feelings of southern congressional leaders. (Troutman affidavit, pp. 10–11.)

After the plaintiff had met with numerous southern congressmen and senators, he again met with President Kennedy and furnished the information which he had acquired. The President then told him that it was now timely for him to discuss the problem with those responsible for the case at the Justice Department, and thereafter he (plaintiff) called on Mr. Katzenbach, then Deputy Attorney General, who made an appointment for him with Mr. Orrick, the Department attorney handling the case. Plaintiff pointed out to Mr. Orrick the merits of Southern Railway's legal position as opposed to the position of the ICC. (Troutman affidavit, p. 12.)

On August 21st a temporary restraining order against the cancellation action had been granted by the United States District Court in the action filed in Cincinnati. So far as appears, plaintiff took no part in this proceeding.

During the week of September 15, 1963, plaintiff again met with the President, and his affidavit continues that:

"On * * * September 18, 1963 President Kennedy told me that he understood that the Justice Department would make its appearance in the case the next day and would support Southern Railway's position in the grain rate case." (Troutman affidavit, p. 16.)

Thereafter, on September 19, 1963, the Department of Justice filed its pleading in the Cincinnati case which, as plaintiff says, "had the effect, in substance, of taking the position of Southern Railway in the matter and not the position of the ICC." (Troutman affidavit, p. 17.) Apparently this solved Southern's problems.

Thereafter, on September 30th the plaintiff received from the president of Southern Railway a letter thanking him for his help, and on September 23, 1963, plaintiff returned to Washington and thanked the President for his interest and attention. (Troutman affidavit, pp. 18–19.)

Plaintiff's affidavit then states that:

"Soon after the desired result was obtained * * * Mr. Wilbanks came to my office and thanked me again for the job I had done and said he wanted to discuss with me settling Southern's obligation to me for the services performed."

Plaintiff then told Wilbanks that he was still vitally interested in joint development of air rights as a means of settlement in lieu of cash, to which Wilbanks replied that he would again immediately undertake to bring about Southern's active interest in the project, his feeling being that in consideration of the fine job plaintiff had done, he would be able to convince the Southern Railway to go forward with it. (Troutman affidavit, pp. 19–20.)

Thereafter, so far as appears, nothing happened until March 3, 1965, when the President of the Southern Railway informed the plaintiff that Southern Railway had decided to proceed independently to develop its own air rights. Still later, on August 23, 1965, plaintiff wrote the president of Southern that thus far he (plaintiff) had treated his compensation and the air rights matter together, but that now he desired them separated so that each could stand on its own bottom. Thereafter, in late September, 1965, plaintiff had not had a reply to his letter of August 23rd addressed to the president of Southern. At that time Wilbanks came to see plaintiff, telling plaintiff that he (Wilbanks) was disturbed to hear that plaintiff was displeased, to which plaintiff replied:

"I told him that I was very much displeased, that as he well knew I had expected to be compensated * * * either by joining air rights or in cash." (Troutman affidavit, p. 22.)

On October 16, 1965, plaintiff received another letter from the president of Southern, saying:

"I feel that it would be better for you and Southern to handle their two Atlanta air rights separately; however, if you have a different thought, I would be glad to know the details."

Thereafter, on June 27, 1967, plaintiff wrote to Wilbanks, indicating his intention to protect his rights to compensation and demanding payment "in money".

Still later, on August 28, 1967, plaintiff wrote Wilbanks, setting out plaintiff's position and saying, among other things:

"First: Southern twice employed me as a lawyer to represent it—(a) to expedite ICC action on Southern's purchase of Central of Georgia, and (b) in getting the Department of Justice to side with Southern in a suit against ICC to uphold Southern's reduction of rates on grain shipments. * * * *"

Plaintiff then recounts his efforts in Southern's behalf, after which the letter continues:

"Third: Each case required extraordinary professional service and each time I was given major responsibility.

"In the Central of Georgia purchase, the issue had been long pending before ICC, and others for Southern had tried and failed to get Commission action. Since the matter had become critical, and since others had failed, unusually competent assistance was called for.

"In the 'grain rate' case, ICC on July 1 had issued its death-dealing order against Southern—to take effect in August. You told me that for Southern to succeed, it was of utmost importance to persuade the Justice Department to oppose (rather than defend) the ICC in federal court. Such opposition seemed to me incredible, but you told me of a precedent. Despite the precedent, however, it was evident that such an unusual action by the Justice Department would probably require specific direction of the President; and, on my direct question to you in my office, you admitted that you desired me to seek the President's intervention on Southern's behalf against the ICC. Unquestionably, obtaining such presidential action would be an extraordinary achievement."

In the same letter plaintiff recounts his efforts on behalf of Southern, both in studying the case and in discussing it with the President. He also recounts his discussions with agriculture commissioners and senators, and then says:

"These efforts led to the desired results from the Justice Department— (a) in opposing the August injunction, and (b) pleading on behalf of Southern in September."

During the period in question the Attorney General in charge of the Justice Department was Mr. Robert F. Kennedy, the brother of the President.

The letter ends by saying that:

"To protect my legal rights it may be necessary to institute legal action by September 20—the anniversary of the date that the Justice Department filed its pleadings in the 'grain rate' case."

Suit was filed on September 15, 1967.

■ Based on the foregoing facts, the court concludes that the claim for services rendered in connection with the "Central of Georgia matter" is barred by the four-year statute of limitations contained in Georgia Code § 3–711, and that, as to this claim, the motion for summary judgment should be granted.

With respect to this phase of the case, the evidence shows without dispute that the services rendered began in October, 1962, and were concluded on November 8, 1962. Obviously, both parties recognized that the work was complete at that time, and they in fact discussed the manner of payment. Not a scintilla of evidence suggests that anything was done or expected to be done after that date, and clearly the statute began to run in November of 1962. Since suit was not filed until September 15, 1967, this part of the claim is clearly barred, whether it be treated as sounding in quantum meruit, Cooper v. Claxton, 122 Ga. 596, 50 S.E. 399, or otherwise, Blackstock v. Murphy, 220 Ga. 661, 662–663, 140 S.E. 2d 902.

With this conclusion the court might well end its discussion of the Central of Georgia claim, except that plaintiff seeks to avoid this result by making these contentions: First, he says that the ICC approval of the Central acquisition on November 8, 1962 was only "conditional" in character and not final. It appears, however, that plaintiff was not employed to terminate the matter but merely to "expedite" it. It also appears that the only condition annexed to the ICC order was that the Commission be assured of Southern's ability to obtain the necessary funds on reasonable terms. Apparently these funds had already been arranged. At any rate, nothing was expected or performed by plaintiff in this regard, and it is not contended that the condition was not fulfilled in routine fashion and within a reasonable time. This excuse is rejected.

Second, plaintiff apparently seeks to tie the Central of Georgia transaction and the grain rate case together for purposes of the statute of limitations. This appears from his letter of August 28, 1967, in which he says:

"* * * To protect my legal rights, it may be necessary to institute legal action by September 20—the anniversary of the date that the Justice Department filed its pleadings in the 'grain rate' case."

It conclusively appears, however, that the two employments were entirely separate. In fact plaintiff himself has treated them so throughout. Thus, his complaint says in paragraph 2 that "Defendant employed plaintiff to perform services for it in two (2) separate matters. * * *" His letter of August 28th likewise makes reference to his being "twice employed", and throughout refers to the "initial employment" and the "second employment". It is also clear that when the first employment terminated neither party knew or dreamed there would ever be a second employment. On the contrary, they considered the employment at an end and actually discussed compensation for the Central of Georgia matter at that time. This contention is likewise without merit.

■■ Finally, plaintiff says that the defendant is estopped to defend on the statute of limitations by reason of its having led plaintiff to believe that he would be paid for his services in the Central of Georgia matter not in cash, but by having defendant join with plaintiff in developing their respective air rights. Apparently plaintiff thereby seeks to bring himself within the provision of Georgia Code § 3–807, which provides that:

"If the defendant * * * shall have been guilty of a fraud by which the plaintiff shall have been debarred

or deterred from his action, the period of limitation shall run only from the time of the discovery of the fraud."

It has been uniformly held, however, that this section requires active, actionable fraud involving moral turpitude before the statute will be tolled. Carnes v. Bank of Jonesboro, 58 Ga.App. 193, 198 S.E. 338, aff'd 187 Ga. 795, 2 S.E.2d 495, 130 A.L.R. 1; Anderson v. Gailey, N.D. Ga., 33 F.2d 489, 592; Stephens v. Walker, 193 Ga. 330, 18 S.E.2d 537.

Simply put, the facts here show no actual fraud. The very most they show is that plaintiff very much desired to tie in his compensation with a joint venture in developing air rights and that the defendant, at best, only promised to "consider" such a proposal. Promises to consider are like promises to pay—they are sometimes broken—but such a breach ordinarily and under the facts of this case, even if shown, falls far short of establishing actual fraud. Moreover, it appears that the defendant did "consider" such a proposal and that as early as March 3, 1965, the president of Southern Railway informed plaintiff that the railway "had decided to proceed independently to develop its own air rights." The same statement was made in Southern's letter of October 16, 1965, more than one year before this suit was filed. It thus conclusively appears that if plaintiff was deterred at all by these air rights negotiations, the deterrent was removed at a time when he still had more than one year within which to bring suit and that he failed to do so. As American Jurisprudence says:

" * * * [W]here the inducement for delay or the hindrance to the commencement of an action has ceased to operate before the expiration of the limitation period, so as to afford the plaintiff ample time thereafter in which to institute an action prior to the running of the statute, he cannot excuse his failure to do so on the ground of estoppel." 34 Am.Jur., Limitation of Actions, § 412.

The motion for summary judgment as to the Central of Georgia matter is granted. Since the court has concluded that it is barred by the statute of limitations, it is not necessary to consider whether, in this instance, the employment was likewise contrary to public policy.

The right of plaintiff to claim compensation for services rendered in the "grain rate case" presents a more complex question.

In this regard it may be noted that the practice of seeking personal and political favors from kings and public officials is a sport as old as government itself—and, within certain limits, there appears to be nothing wrong with it. It is sanctioned by history, and in one instance is virtually invited by the last clause of the First Amendment to the Federal Constitution. It has built railroads and launched fleets. In Spain it is reputed to have made financially possible the discovery of this continent. In England, Spain and France, to some degree and in one way or another, it led to the founding of every colony in the New World. But in one respect, personal or political influence is like virtue; it must not be sold. And if it is sold, or even contracted for, the courts may not and will not enforce the bargain.

This much is clear. But what is political influence? To simply furnish facts or law or even theories to an official to be considered on their merits is clearly not prohibited. To seek action based on facts so furnished may or may not be. To seek favors irrespective of the facts clearly is. In this area, the line between what is permissible and what is not is frequently dim. Often a decision has to be based on inference alone, and the question is usually one of fact. Numerous authorities might be cited, but since the court has decided that on this point the motion for summary judgment must be denied in any event, only a few will suffice.

Thus, in stating the existence of such a public policy, the Supreme Court of the

United States (in a case involving Georgia citizens) has said:

"Agreements upon pecuniary considerations, or the promise of them, to influence the conduct of officers charged with duties affecting the public interest, or with duties of a fiduciary capacity to private parties, are against the policy of the State to secure fidelity in the discharge of all such duties and are void." Woodstock Iron Co. v. Richmond & D. Extension Co., 129 U.S. 643, at 644, 9 S.Ct. 402, 32 L.Ed. 819.

Again in Scott v. Beams, 10 Cir., 122 F.2d 777, 784, cert. den. 315 U.S. 809, 62 S.Ct. 794, 86 L.Ed. 1208, the rule is stated as follows:

"A contract which by its inherent tendency is inimical to public welfare or inconsistent with good morals violates public policy and will not be enforced, either directly or indirectly. The validity of a contract in point of being against public policy must be measured by its inherent tendency, not the good faith of the contracting parties or the manner in which they carried it out. And the success or failure which attends the fulfillment of a contract tainted with trespass upon public policy is without moment. This comprehensive doctrine is of such long standing and wide familiarity that it cannot be necessary to review the cases without number in which a great variety of contracts have been uniformly overturned. It is equally well settled that an agreement relating to a suit or proceeding in court which invites or promotes interference with full and impartial justice therein violates public policy and will not be enforced in any manner, though no actual corruption is involved."

On the other hand, not all such contracts fall in this category. As the Fifth Circuit said (in reversing this court) in Steele v. Drummond, 11 F.2d 595:

"We do not understand that an agreement to secure legislation for legitimate purposes, and in a legitimate manner, is against public policy, nor unless that agreement by its terms or by necessary implication requires performance of acts which are of a corrupt character, or which have a corrupting tendency. 6 R.C.L. 732."

The same case then went to the Supreme Court of the United States, 275 U.S. 199, 205, 48 S.Ct. 53, 54, 72 L.Ed. 238, where the Court said in discussing public policy:

"While the principle is readily understood its right application is often a matter of much delicacy. It is only because of the dominant public interest that one, who has had the benefit of performance by the other party, is permitted to avoid his own obligation on the plea that the agreement is illegal. And it is a matter of great public concern that freedom of contract be not lightly interfered with. Baltimore & Ohio Southwestern Ry. [Co.] v. Voigt, 176 U.S. 498, 505, 20 S.Ct. 385, [44 L.Ed. 560, 564]. The meaning of the phrase 'public policy' is vague and variable; there are no fixed rules by which to determine what it is. It has never been defined by the courts, but has been left loose and free of definition, in the same manner as fraud. 1 Story on Contracts (5th Ed.) § 675; Pope Mfg. Co. v. Gormully, 144 U.S. 224, 233, 12 S.Ct. 632 [36 L.Ed. 414, 418]. It is only in clear cases that contracts will be held void. The principle must be cautiously applied to guard against confusion and injustice. Atlantic Coast Line R.R. Co. v. Beazley, 54 Fla. 311, 387, 45 So. 761; Barrett v. Carden, 65 Vt. 431, 433, 26 A. 530, 36 Am.St.Rep. 876; Richmond v. Dubuque & Sioux City R.R. Co., 26 Iowa, 191, 202; Egerton v. Earl Brownlow, 4 H.L.Cas. 1, 122 [10 Eng. Reprint 359, 24 End.Rul.Cas. 118]; Richardson v. Mellish, 2 Bing. 229, 242, 252 [130 Eng.Reprint, 294]. Detriment to the public interest will not be presumed where nothing sinister or improper is done or contemplated. Valdes v. Larrinaga, 233 U.S. 705, 709, 34 S.Ct. 750 [58 L.Ed. 1163, 1165]."

The Georgia authorities (important in a diversity case) seem to be more in accord with the latter citations. They hold, in substance, that contracts to influence government officials are not void merely upon an appearance before the official to make arguments upon the merits of a question, and that only the elements of "personal influence" and "sinister means" will void the contract and deny it enforcement. Meadow v. Bird, 22 Ga. 246, 248. See also Cary v. Neel, 54 Ga.App. 860, 189 S.E. 575.

Finally, see Old Dominion Transportation Co. v. Hamilton, 146 Va. 594, 131 S.E. 850, 857, 46 A.L.R. 186, where the Court said:

"* * * [E]ven if the jury believed from the evidence that either personal or political influence was exerted by the plaintiff, but merely to secure a hearing from the city authorities, and an opportunity to present the matter in issue upon its merits, and that when such opportunity was secured the case was presented upon its merits and upon its merits alone, then in that event the jury should have been told that the plaintiff was entitled to a judgment."

■ Here, the conduct of plaintiff might very well support a strong inference that plaintiff was seeking to influence the President to influence his brother to take an action favorable to plaintiff's client. A jury may draw such an inference, but on summary judgment this court cannot do so. On summary judgment, inferences are for juries, not for the court.

Under the facts, many questions remain unanswered. Unquestionably, the plaintiff presented memorandums of fact and law to the President. Did he present the matter solely on its merits, or did he ask the President, for some other reason, to intercede with his brother, who was Attorney General? Or did he do both? What was he employed to do? All of these questions will have to be submitted to a jury under proper instructions. See

the instruction recommended by the Virginia Court of Appeals in Old Dominion Trans. Co. v. Hamilton, supra.

As to this aspect of the case, the motion for summary judgment is denied.