# Mobile & Ohio Railroad Co. v. Nicholas, et al.

*Bill in Equity by Stockholders, against Railroad Company, to Enjoin its Refusal to Accept the Votes of Complainants, at an Election to be held at Stockholders' Meeting; and, to Enjoin Trustees from Casting the Vote of said Stock.*

1. *Voting by proxy not unlawful.*—It is not unlawful, *per se,* to separate the voting power from the stockholder, so far as the appointment of a proxy may be considered a severance of the voting power, and the charter expressly grants the power. Where a proxy is duly constituted, and there is no limitation upon his power, a vote by such proxy binds the stockholder to the same extent as if cast by the stockholder in person.

2. *Invalid acts of proxy.*—It is not held that a power of attorney, absolute in terms, will authorize the agent or proxy to effect contracts outside the scope of his authority, or that he, any more than his principal, could do acts contrary to law or public policy. The invalidity of acts done by proxy, contrary to law or public policy, does not rest upon the ground that there has been a separation of the voting power from the stockholder, but because of the unlawful act or purpose itself.

3. *Same; upon what it depends.*—In determining the validity of the agreement which provides for the vesting of the voting power in a person other than the stockholder, regard should be had to the condition of the parties, the purpose to be accomplished, the consideration of the undertaking, interests which have been surrendered, rights acquired and the consequences to result.

4. *When agreement not against public policy.*—When in a suit to cancel an agreement between the stockholders of a railroad company, its creditors, and others, providing for a reorganization of the company, the railroad company was at the time of such agreement in the hands

[Mobile and Ohio R. R. Co. v. Nicholas, et al.]

of a receiver; its indebtedness exceeded the value of its property; when there were several decrees of foreclosure existing, the execution of which, and the prosecution of lawful claims against the company, would have absorbed the entire interest of the stockholders, the agreement provided for a transfer of the decrees of foreclosure and the creditor's claims to a trustee, the issue of debentures to the creditors in lieu of their original evidences of debt, and a mortgage to secure them; the establishment of a sinking fund for the payment of the debentures; and for an irrevocable power of attorney vesting the right to vote the stock in the trustee and the debenture holders until the debentures were paid; for the discharge of the receiver, and the restoration to the railroad company of its property and control of the road; the agreement for re-organization was not against public policy, and was valid.

5. *The exchange of debentures for bonds did not affect the voting power given the debenture holders.*—Where an agreement between the stockholders of a railroad company, its creditors and others, provided for the issue of secured debentures to the creditors in lieu of their original evidences of debt, which were transferred to a trustee; the establishment of a sinking fund for the payment of the debentures; and under a trust deed, with an irrevocable power of attorney, the right to vote the stock was vested in the trustees and the debenture holders until the debentures were paid, and by subsequent agreement the issue of general mortgage bonds for the benefit of the company was authorized, and it was provided therein that debentures might be surrendered to the trustee, and bonds be issued in lieu thereof; "that the lien of the debentures deposited with the trustee shall be maintained for the security and benefit of the bonds issued under said new mortgage; that the sinking fund under the debenture deed of trust shall be continued and maintained until all the debentures not held by the sinking fund shall be deposited with the trustees of the general mortgage," etc. *Held*, that the surrender of the debentures in exchange for bonds under the latter agreement did not extinguish the debentures so as to reinvest in the stockholders the voting power conveyed for the benefit of the debenture holders under the first agreement.

6. *When the relation of surety does not exist.*—A surety is one who contracts to answer for the "debt, default or miscarriage of another" —an obligation accessorial to that of a principal debtor—but the relation of surety does not exist where the consideration moves directly to or from the person claiming the privilege of surety.

7. *Stockholders not sureties of corporation.*—All the property of a corporation being primarily liable for the corporate debts and liabilities, and the stockholders being liable therefor only to the extent of their stock, the corporation has no separate entity from its stockholders as to such corporate debts and liabilities, and as to these, no relation of principal and surety can exist between the corporation and its stockholders, as such.

8. *Same.*—The conveyance by a stockholder of his voting power to a trustee under an agreement for the security of corporate creditors does not constitute the stockholder a surety of the corporation so that a modification in the agreement by the trustee will reinvest the stockholder with the voting power.

APPEAL from Mobile Chancery Court.
Heard before the Hon. WM. H. TAYLOE.

E. J. PHELPS, and FRED. W. WHITRIDGE, for railroad company, appellants. 1. *The injunction granted should be dis-*

*solved.* This is the main question before the court. The injunction was mandatory, was unprecedented, and improvidently granted. As to how mandatory injunctions should be treated. (*a.*) *The general principle;* citing High on Injunctions, sec. 2; Kerr on In. Vol. 1, p. 51; *Mayer's Appeal,* 23 P. F. Smith, 164; Redfield Law of R'ways, vol. 2, p. 417; *Isenbery v. E. India Est. Co.,* 33 L. J. 392. (*b*) *Cases in which mandatory injunction has been granted.*—4 Sim. 13; 1 DeG. & Sm. 672; 1 H. & J. 173; 1 Kay & J. 392; 8 Jur. N. S. 987; 40 N. Y. 191; 1 Saw. U. S. 420; 1 Bro. C. C. 588; 68 Pa. St. 320. (*c*) *Mandatory injunction not usually granted before a hearing.*—Kerr on In. vol. 11, p. 57, 10 Am. Ency. of Law. 791, *et seq.* (*d*) *Not granted without notice.* No case can be found. This case is unique in this respect. (*e*) *Irreparable damage must be shown.* (*f*) *Property not transferred by injunction before trial or answer.*—15 Law. Bul. 419; C. E. Green. 283; 14 N. J. Eq. 380; 5 Blatch. U. S. 525. 2. *The bill is without equity.* The original power of attorney is not void, nor against public policy, as is insisted in the first proposition of complainant's bill.—34 Fed. Rep. 582; 100 U. S. 605; 99 U. S. 611; 107 U. S. 29; 1 Morawetz on Corp. §§ 483, 224, 14 Weekly Law Bul. 68; 120 Mass. 501; 42 Barb. 169; 2 Cin. Sup. Ct. R. 178; 28 Kan. 265; 84 Ala. 608; 60 Conn. 553. From all the cases it is clear that: (1) power to vote upon stock given for an actual and valuable consideration, has always been upheld, *unless,* (2) an element of fraud was introduced into the original agreement, or (3), the control was to be exercised for some improper purpose. The mere control of the corporation by those having a large interest therein is of itself not improper.—*The stockholders were not sureties.* In this case, in no sense can the stockholders be held to have a separate entity from the corporation whose stock they held. The surrender of the voting power was the main incentive to the readjustment agreement of 1876. The second proposition of complainants' bill is that the Trust Company was guilty of a gross violation of trust in voting to authorize the general mortgage, and that the creation of the general mortgage operated to extinguish the debentures. But the mortgage itself says that the debentures should be kept alive. *The general mortgage is either valid or void.* The complainants can not affirm part and reject part. The stockholders must relinquish the benefit derived from the general mortgage, if it is bad, before they can so declare it.—92 Ala. 406; 98 U. S. 629. 3. The long acquiescence of the assented stockholders in the voting power of the Trust Company amounts to indefensible laches, by which they are presumed to have waived their objections,

[Mobile and Ohio R. R. Co. v. Nicholas, et al.]

and are estopped from now attacking it, and warrants the conclusion that they have ratified the several sets of bonds authorized through this voting power, and in particular the general mortgage now specifically attacked. First. The principle of waiver, arising from the lapse of time, acquiescence or laches, like the principle of the statute of limitations, is founded on a salutary policy. *Kent v. Quicksilver Mining Co.*, 78 N. Y. 184, 185; *Upton v. Tribilcock*, 91 U. S. 55; *Brown v. County*, 95 U. S. 160, 161; *Oil Co. v. Marbury*, 91 U. S. 592, 593, *Sullivan v. R. R.*, 94 U. S. 811; *Godden v. Kimmell*, 99 U. S. 201; *Terry v. Anderson*, 95 U. S. 633, 634; *Mills v. Scott*, 99 U. S. 27; *Erlanger v. Sombrero Co.*, L. R., 3 App. Cas., 1231, 1243, 1244. Second. This defense of waiver. from mere delay, or acquiescence or laches, will be raised by the court *sua Sponte.*—*Sullivan v. R. R.*, 94 U. S. 811; *Godden v. Kimmell*, 99 U. S. 210, 212; *Marsh v. Whitmore*, 21 Wall. 184, 185; *McLean v. Fleming*, 96 U. S. 256, 257. Third. Any excuse for such delay, acquiescence or laches which would prevent the presumption or ratification must be affirmatively and specifically shown.—*Badger v. Badger*, 2 Wall. 95; *Harwood v. R. R.*, 17 Wall. 81; *Marsh v. Whitmore*, 21 Wall. 184, 185; *Luxembourg Ry. Co. v. Magnay*, 25 Beavan, 598; *Wollensak v. Reiher*, 115 U. S. 101. If fraud or concealment is alleged the plaintiff must show, distinctly and specially, the time when it was discovered, how the discovery was made, and why it was not made sooner. A general allegation of ignorance will not do.—*Stearns v. Page*, 7 Howard, 829; *Fisher v. Boody*, 1 Curtis C. C. 220; *Martin v. Smith*, 1 Dillon C. C. 96, 97; *Follansbe v. Kilbreath*, 17 Ill. 522, 529; *Grynes v. Sanders*, 93 U. S. 57, 59, 60; *Brown v. County*, 95 U. S. 159; 160; *Phasphate Sewage Co. v. Molleson*, L. R., 1 App. Cas. Ho. Lds., 784, 785; *Heymann v. Ry. Co.*, L. R., 7 Eq. Cas. 155, 169; *Peel's Case*, L. R. Ch. App., 684, 685; app'd in 91 U. S. 55. Fourth. In all cases the option to avoid a voidable contract, must be exercised within a reasonable time or the plaintiff is estopped or will be presumed to have ratified it. The time is not measured by any number of days or years, in analogy to the statute of limitations. In the following cases the parties were held to have lost their right to any relief, by reason of their delay.—*Badger v. Badger*, 2 Wall. 87; 94; *McLean v. Fleming*, 96 U. S. 245, 257; *Sullivan v. R. R.*, 94 U. S. 807, 811, 812; *Godden v. Kimmell*, 99 U. S. 202, 208; *Marsh v. Whitmore*, 21 Wall. 179, 183; *Johnson v. Johnson*, 5 Ala. 91, 104; *Fisher v. Boody*, 1 Curtis C. C., 206, 218; *Speidel v. Henrici*, 120 U. S. 337; *Landsdale v. Smity*, 106 U. S. 391; *Prendergrast v. Turton*, 1 Younge & Coll. Ch., 98,

111, 112; *Clegg v. Edmondson*, 8 De Fex, M. & G. Ch., 787, 810, 813; *Wentworth v. Lloyd*, 32 Beavan Ch. 467, 474; *Denton v. Macneil*, L. R., 2 Eq. Cas. 356; app'd in 91 U. S. 55; *Harwood v. R. R.*, 17 Wall. 78, 81; *Vigers v. Pike*, 8 Cl. & Fin. Ho. Lds., 562, 650; *Oil Co. v. Marbury*, 94 U. S. 587-91; *Hayward v. Nat. Bank*, 96 U. S. 613, 617, 618; *Upton v. Tribilcock*, 91 U. S. 55; *Ex parte Briggs*, L. R. 1 Eq. Cas. 485, 487. The question of laches may be raised by de-. murrer.—*Nat. Bank v. Carpenter*, 101 U. S. 567.

E. L. RUSSELL, and R. P. DESHON, for appellants.

The original bill should have been dismissed, and the injunction thereon dissolved.—*Woodruff v. Dubuque*, 30 Fed. Rep. 91; *Griffith v. Jewett*, 15 Wkly Bul. 422; *Faulds v. Yeates*, 57 Ill. 421. Where an injunction, final in its nature, has been obtained and used to gain an unjust advantage, it should be dissolved and the parties placed in *statue quo*. *Vanzant v. Mining Co.*, 2 McCreary, 642; *Putnam v. Sweet*, 2 Pinney (Wis.) 241-44; High on Injunctions, 516, 1233, 1580; Cook on Stock and Stockholders, § 614; *Hilles v. Parish*, 14 N. J., Eq. 480. And where an unjust advantage has been gained by the process of the court, the court which issued the process is the forum where it should be. corrected. *Callan v. McDaniel*, 72 Ala. 104; *Balkum v. Harper*, 50 Ala. 372; *Putnam v. Sweet*, 2 Pinney (Wis.) 341-44. The right of the corporation to maintain its cross-bill is supported by the following authorities.—*Hawes v. Oakland*, 104 U. S. 459; *Greaves v. George*, 69 N. Y. 154; *Beaver v. Boston Theatre*, 104 Mass. 378; *Tuscaloosa M'fg Co. v. Cox*, 68 Ala. 73; *Nathan v. Tompkins*, 82 Ala. 444; *Mack v. DeBardeleben C. and I. Co.*, 90 Ala. 401; *Parsons v. Joseph*, 92 Ala. 406; *Johnson v. Jones*, 23 N. J., Eq. 217; *Boston and Franklinite Co. v. N. J. Zinc Co.*, 2 Beasley's Rep. 219; *Mechanics' Nat. Bank v. Burnett M'fg Co.*, 32 N. J., Eq., 238–339; Moriwetz Private Corp. 255, 281, 542 and 543. The charter of the Mobile and Ohio Railroad Company authorizes the stockholders to vote in person or by proxy, and authorizes the company to pass by-laws. By the provisions of the charter and by-laws, no person can vote at an annual stockholders meeting unless the number of shares claimed to be held by him are to his credit on the stock transfer books of the company at Mobile, Ala., after the stock transfer books have been closed as advertised.—Secs. 20, 21 and 22 of the By-Laws of the Company. An arrangement can be made between creditors of the corporation and its stockholders to create, for the benefit of the creditors, an irrevocable proxy to vote shares of the

stockholders, provided such proxy is not a dry trust, or created for illegal purposes.—*People v. Robinson et al.*, 10 Am. & Eng. Corp. Cases, 59 ; *Saint Lawrence Steamboat Co. v. ——————*, 45 N. J., Law Rep., 529–540 ; *Ex parte Wilcox*, Cowan, 402 ; *Peoples v. Kipp*, 4 Cowan, 302 and note ; *In re Barker*, 6 Wend. 509 ; *In re Cecil*, 26 Howard. 477 ; Boone on Corp. § 69 ; *Nat. Commercial Bank v. McDonnell, et al.; Dargan v. McDonnell*, 9 So. Rep. 149 ; *Vermont & Canada R. R. v. Vermont Cent. R. R.*, 50 Vert. 548 ; Jones on Corporate Bonds and Mortgages, § 418, 419 ; *Gilfillin v. Union Canal Co.*, 108 U. S., 401–406 ; *State ex rel. v. Daniel McLaren, et al.*, 4 Am. Corp. Cases, 20–24 ; *Bayley v. R. R. Co.*, 17 Wallace, 106 ; *McIntosh v. Flynn P. M. R. Co.*, 32 Fed. Rep. 350, 353 ; *Brown v. Pacific S. S. Co.*, 5 Blatch, 5 ; An irrevocable power of attorney, when coupled with an interest, or necessary to effectuate a security, is valid.—*Chambers v. Seay*, 73 Ala. 377 ; *Hilles v. Day*, 34 N. J. Eq. 150 ; *Mathewson v. McNabors, Admr.*, 9 Vroom, 537 ; *Walker v. Denison*, 86 Ill. 145 ; Jones on Corporate Bonds and Mortgages, Sec. 301 ; 2 Jones on Mortgages, Sec. 1792, 1794 ; 1 Moriwetz on Private Corp. Sec. 224 ; Shepeug Voting Trust Cases, 60 Conn. 533 ; *Griffith v. Jewett*, 15 Wkl. Law Bul. 319, relied upon by appellees in cases of dry trust to effectuate an illegal purpose. There is nothing contrary to public policy, where proxies to vote the shares of stock are created with an interest to effectuate the securities of the corporation.—*State ex rel. v. O. M. R'y*, 28 Wkl. Law Bul., pp. 415, 430 ; *Miller v. Ratermann*, 43 Am. & Eng. R. R. Cases, 348–9 ; *Fletcher v. St. L., Kansas City & N. Y. R. R. Co.*, 69 Missouri, 242. The consummation in 1879 of the re-organization agreement of October 1st, 1876, created the relation of principal and agent between the assenting stockholders and the Farmers' Loan and Trust Company to vote their stock. The stockholders did not become sureties for the railroad company.—*Chambers v. Seay*, 73 Ala. 377 ; *Hill v. Day*, 34 N. J. Eq. 150 ; 2 Jones on Mortgages, Sec. 1792, 1794 ; 1 Moriwetz Private Corp. Sec. 224 ; *Evans v. Keener*, 9 Ala. 46 ; *State ex rel. v. O. M. R'wy*, 15 Wkl. Law Bul. 415, 430. The issuance of the four per cent. bonds in May, 1888, has been ratified by the assenting stockholders, and the creditors are entitled to the benefits thereof without releasing the proxy before made to them by the stockholders. *Schumpert v. Dillard*, 55 Miss. 363 ; *Cullen v. Branch Bank of Mobile*, 23 Ala. 797 ; 2 Jones on Mortgages, Sec. 929 and 930 ; *Ames v. New Orleans, Mobile & Texas R. R. Co.*, 2 Woods C. C. R. 206 ; Jones on Corporate Bonds and Mort-

gages, Sec. 309; *Bank v. Lawrence & Co.,* 96 N. C., 298; *Stevens v. Midhause R. R. Co.,* 7 Moaks, 555; *Kent v. Quicksilver Mining Co.,* 78 N. Y. 159; *Kitchen v. St. Louis, K. C. & N. W. R. R. Co.,* 69 Mo. 264; *Thames v. Central State Ins. Co.,* 49 Ala. 577; Am. & Eng. Ency. of Law, 419; *Parsons v. Joseph,* 92 Ala. 406.

HANNIS TAYLOR, for the Farmer's Loan & Trust Co., appellant—1. Gave a history of the affairs of the Mobile & Ohio R. R. Co. from the date of the settlement, May 1, 1879, to the commencement of this litigation. In the lengthy and exhaustive argument contained in his printed brief in this cause he combatted the contention of complainants that the vesting in the debenture holders of the power to cast the vote of the stockholders was void, maintaining:

1. That nothing is better settled than that an irrevocable power of attorney, coupled with an interest, or necessary to effectuate a security, is valid.—*Chambers v. Seay,* 73 Ala. 377; *Hill v. Day,* 134, N. J., Eq., 150; 9 Vroom. N. J. 537; 86 Ill. 145; Jones on Corp. Bonds & Mortgages, § 301; 1 Mer. on Priv. Corp. § 2224.

2. It has been expressly held that agreements of stockholders to appoint a trustee to vote their stock are not against public policy.—*Brown v. Pac. S. S. Co.,* 5 Black. 525 *Moses v. Scott,* 84 Ala. 608; 1 Mer. on Corp. § 224.

3. *The charter vests in each shareholder the right to vote by proxy.*—At common law a stockholder had no right to cast his vote by proxy.—Davies, 116–119; *Attorney-General v. Scott,* 1 Ves. 413; *Taylor v. Griswold,* 14 N. J. Law, 223; *Cring v. First Presby. Ch.,* 88 Penn. State, 42. To remove the inconvenience resulting from the common law rule, the right to vote by proxy has been almost universally granted to stockholders in the United States.—Cook on Stock and Stockholders, § 610; 47 Hun., 228.

4. Upon the question of *ultra vires,* see *Jones v. Haversham,* 107 U. S. 174.

5. But the main question in this case is whether the contract embodied in the Debenture Deed of May 1, 1879, has been extinguished or *novated* by the subsequent contract embodied in the general mortgage of May 15, 1888. In discussing this aspect of his case Mr. Taylor enters upon an exhaustive examination of the doctrine of Novation in the Ancient Roman Law; Novation in the Modern European Law, the Code Napoleon, Code of Louisiana, Novation in English and American Law—citing under these heads numerous cases and treaties, closing that branch of his sub-

[Mobile and Ohio R. R. Co. v. Nicholas, et al.]

ject with the doctrine of Novotion as defined by the Supreme Court of Alabama, citing under this last head : *Abercrombie v. Moseley,* 9 Port. 150 ; *Scott v. Myatt & Moore,* 24 Ala. 495 ; *Mooring v. Mob. M. D. & M. I. Co.* 27 Ala. 258 ; 35 Ala. 700 ; *Ficklin v. Williams,* 38 Ala. 685 ; 42 Ala. 151 ; 46 Ala. 299 ; *Keel v. Larkin,* 72 Ala. 493 ; 74 Ala. 581–2 ; 76 Ala. 141 ; *Lee v. Green,* 83 Ala. 491, and 85 Ala. 401.

6. As to whether complainants were sureties, and as such released by the novation : 22 How. 341–352. *Grafton Bank v. Kent,* 4 N. H., 221 ; *Hubbard v. Gwiney,* 64 N. Y. 457 ; 46 Ill. 428 ; *Fowler v. Alexander,* 1 Heiskell, 425 ; *Creigh v. Heibuck,* 5 W. Va., 140 ; *Kennebeck Bank v. Turner,* 2 Greenl. 42 ; 2 Am. L. Cases, 441 ; *Ray v. Simpson,* 22 How. 341–52 ; *Shepherd v. May,* 115 U. S. 505–12.

H. C. TOMPKINS, GAYLORD B. CLARK, WM. J. CURTIS, and ALFRED JARETZKI, for appellees.—First. The voting trust, whereby the franchise and privilege of voting are severed from the ownership of the stock, for the purpose of exercising such franchise in the interest of the debenture creditors, is void *per se*: 1. Because it contravenes the express language of the charter of the railroad company. 2. Because it is against public policy. 3. Because it is *ultra vires* the trustees.

1. *It contravenes the express language of the charter.*—Citing *Thomas v. Railroad Company,* 101 U. S. 71 ; *New York & Md. Line, R. R. Co. v. Winans,* 17 How. 30.

2. *The voting trust is against public policy.*—*Alcott v. The Supervisors,* 16 Wall. 678 ; *Richmond and Danville Extension Co. v. Woodstock Iron Co.,* 129 U. S. 643 ; *Bestor v. Wathen,* 60 Ill., 131 ; 62 Ill., 309 ; 5 Oregon, 107 ; 18 Pick., 472 ; *Hafer v. N. Y. Lake Erie and W. R'wy Co.,* 14 Weekly Law Bulletin, 68 ; *Griffith v. Jewett,* 15 Weekly L. Bull., 419 ; *Woodruff v. The DuBuque & S. City R'way Co.,* 30 Fed. Rep. 91 ; *Starbuck v. The Mercantile Trust Compy.* 9 Corp. Journal, 203 ; *Fisher v. Bush,* 35 Hun., 641 ; *Moses v. Scott,* 84 Ala. 608 ; *Vanderbilt v. Bennett,* 2 R'way and Corp. Law Journal, 408. From the above authorities the rule may be fairly deduced, that a stockholder cannot irrevocably divest himself of the power to vote on his stock.

3. *The voting trust is ultra vires the trustee.*

Second. The voting trust, though it may be irrevocable in its terms, is nevertheless revocable in law ; such revocation to be made effective either by voluntary acts of the stockholders or by the process of the courts.—*Woodruff v. Du-*

[Mobile and Ohio R. R. Co. v. Nicholas, et al.]

*buque & R. R.*, 30 Fed. Rep. 91; 1 Story Eq. J. Pr. 694; 21 Fed. Rep. 537; Adam's Eq., 375.

Third. The voting trust is dissolved or discharged in accordance with the terms of the act or deed of its creation by the extinguishment of the debt which it was created to secure.—*Billingsley v. Harrell*, 11 Ala. 775; *Meyer v. Johnston*, 53 Ala. 325; Bispham's Principles of Equity Jurisprudence, § 143; The Rumford Market Case, 1 Leading Case in Eq. 44.

Fourth. The relation of stockholders who have attempted to part with the voting power of their stock and the debenture holders is that of surety and creditor respectively: 1. By the declarations of the several instruments creating the trust. 2. By operation of law as applied to the transactions.

Fifth. The voting trust has been terminated by the extension and enlargement of the debt and by the substantial modification of the terms upon which the voting franchise is to be exercised: 1. The payment of the debt has been expressly extended for forty years. The debentures were payable at any time; the bonds are payable in forty years. 2. The amount of the debt for which the voting power was pledged was increased from $8,650,000 to $10,500,000. 3. The balance of power and influence in the exercise of the voting power as agreed upon originally has been destroyed, in that other security holders are permitted to dictate how the stock shall be voted—all without the consent of the stockholders.—Brandt on Suretyship, § 21; *Barns, et al. v. Barrow*, 61 N. Y., 42; *Nat. Mech. Bk. Asso. v. Conkling*, 96 N. Y., 122; 3 Denio, 521; 37 Ala. 324; 87 Ala. 236.

COLEMAN, J.—The Mobile & Ohio Railroad Company having made default in the payment of coupons attached to its several bonds, secured by mortgages, proceedings were instituted in the Federal Court for the Southern District of Alabama and other courts, which resulted in decrees of foreclosure, and orders of sale of the property conveyed by the several mortgages or deeds of trust.

In addition to the bonded indebtedness of the railroad company, secured by mortgage, upon which the foreclosure decrees were rendered, there was a large unsecured indebtedness. The total indebtedness largely exceeded the value of the entire railroad property. The railroad company at this time was in the hands of a receiver. Under these conditions an agreement was entered into, dated October 1st, 1876, "between the Mobile & Ohio Railroad Company of the first part, and the various other parties whose names are

[Mobile and Ohio R. R. Co. v. Nicholas, et al.]

subscribed hereto, being creditors of said company, some holding security as hereinafter specified, and others unsecured, each subscriber for himself, and neither for the other, parties of the second part, Wm. H. Hays of the city of New York, and William S. Pierson of Windsor, State of Connecticut, and T. Haskins Dupuy of Philadelphia, parties of the third part."

The agreement which is made exhibit "A" to the bill, after stating the embarrassed condition of the railroad company, and referring to the bonded creditors of the same, secured by mortgages, the decrees of foreclosure and judgments, and all other creditors, proceeds as follows: "And the undersigned, holders of claims of the various classes against said company, as well as these specified in the said schedule hereto annexed, as judgment creditors and unsecured creditors, have agreed to compromise and compound with said company, upon the said company's issuing new securities for all the said indebtedness, in the manner hereinafter agreed upon, to the end, that if practicable, said foreclosure suits may be discontinued, and the property affected thereby restored to the custody and control of the said company, under the conditions of this agreement, and the stipulations accompanying the same."

The agreement then provides for the issue of seven millions of first mortgage bonds, and then for the issue of eight millions six hundred and fifty thousand of debentures of the first, second, third and fourth series. The main questions involved in the present litigation to be first considered are in respect to the debentures. This plan of adjustment and reorganization was made to depend upon the action of the stockholders, and the bill shows, and it is admitted in argument, that of the fifty-three thousand and two hundred and six shares of the capital stock of the railroad company, forty-five thousand and four hundred and fifty-four shares of the capital stock, assented to the compromise and adjustment, and executed an irrevocable power of attorney, by which their stock should be voted, until the payment or extinguishment of the debentures, as expressed on their face and in the mortgage to secure them, and provision for their payment. All the stockholders who acceded to the terms of compromise and adjustment are denominated "assenting stockholders." Complainants belong to this class. The agreement for the compromise and readjustment is divided into sections and stated in full as exhibit "A" to the bill. We will here state such sections as are most pertinent to the issues presented by the pleadings.

Sec. 14. The said assignees and attorneys shall not be authorized to cancel or surrender any of the existing obligations or evidences of debt of the said corporation, transferred to them under this agreement, unless all the present holders of the mortgage securities of said company shall have become parties to this instrument, and transferred the securities held by them on or before the first day of March, 1877, or at or before such time as the said assignees and attorneys shall have fixed, as in their discretion they may, by successive extensions of not more than sixty days each, nor until said corporation or its stockholders, through legal and proper action of its stockholders, if such action be necessary, or otherwise according to law, shall have entered into an adequate and sufficient arrangement or agreement with said assignment or agreement with said assignees and attorneys, and with the holders of said debentures, enabling the holders of such debentures, or the trustees under said trust deed, to vote at elections for directors of the said company, and irrevocably represent such stock, or a majority thereof, at all stockholders' meetings until such debentures shall be extinguished; and upon that privilege of representation being acquired and vested in or secured to the trustees in said trust deed, or to the holders of the said debentures by the proper and legal action of such corporation or its stockholders, and upon all the new mortgages and securities above called for being issued, then such cancellation and surrender may be fully completed and consummated (except in the contingency provided in paragraph 13 of this agreement), and the property and management of the corporation may be restored to it and said foreclosure suits may be discontinued."

Sec. 20. The trust deed hereinabove provided for, whether executed in pursuance of the compromise agreed upon, or by a new corporation or corporations to be created after a foreclosure, shall contain provision for the creation of a sinking fund for the benefit of the holders of the said debentures in the order in which the interest on such debentures is as above described payable.

Such sinking fund is to consist of the proceeds of all lands owned, and which may hereafter be owned by said company, with the exception of such as are covered by the above mentioned first mortgage, and with the exception of the railway, rails, bridges, fences, warehouses and other fixtures, rights, privileges and real estate belonging to the above mentioned branches, but including all lands not so covered, but conveyed to the Mobile & Ohio Railroad Company by any State

or by the United States. The trustees under said trust deeds are to have power of sale over said lands from time to time, and such trust deeds shall contain clauses properly framed conveying to trustees under such deed the same powers of sale in respect to the lands conveyed thereby as are possessed by the trustees under the now existing first mortgage, and the first mortgage to be created under this agreement is not to apply to or cover such lands, and the proceeds of sales of such lands are to be free from the lien of said new first mortgage, and are to constitute a fund for the exclusive benefit of the holders of said debentures. But such new trust deed shall also contain provision by way of covenant, declaration, grant or otherwise, as said assignees and attorneys may direct, in substance and effect that the amount of the principal and interest payable upon said debentures shall constitute a lien upon the railway property of said existing corporation or of said new corporation or corporations, as the case may require, to such an extent that in case of a foreclosure of said new first mortgage and a sale thereunder, the trustees in said trust deed, for the benefit of holders of said debentures according to their order and priority, shall be entitled to the surplus proceeds of such sale next after payment of said new first mortgage, to the amount of the aggregate principal sum due on such debentures, and so that in case any lien upon said railway property, or any part thereof, shall arise, subsequent to the making of said trust deed, by the act or sufferance of such existing or new corporation and such subsequent lien shall be enforced to the extent of depriving said existing or new corporation of the possession of such railway property and sell the same, clear of all subsequent liens for the benefit of holders of said debentures according to their order and priority, or may exact redemption and payment in full of the principal amount of such debentures before surrendering such property to such subsequent lienors, and said trust deed shall also contain proper covenants and securities for the ascertainment and application of the income of the property of said existing or new corporation and its successors, as the case may require, according to the provisions of this agreement, and there shall also be paid into the sinking fund all the interest accruing on debentures bought for the sinking fund, until all of the debentures shall have been bought, satisfied or extinguished, and there shall also be paid into the sinking fund a further amount equal to the dividend which may hereafter be declared upon the capital stock now existing or hereafter to be created of such company, which

dividend shall not be declared or paid except an amount equal thereto is also paid in at the same time out of the net revenue into the sinking fund.

The trustees making sales of said lands are to deposit the proceeds thereof in the bank of the State of New York, in the City of New York, or such other depository as the trustees in said trust deed may select in the said City of New York, and each six months, that is, on the first days of May and November, the trustees shall advertise in the cities of Mobile and New York, stating the amount so deposited and at the disposition of the sinking fund and asking for tenders thereof in the first series of said debentures then outstanding awarding the amount so deposited to the holders of debentures, tendered at the lowest grades of price, in succession. In default of any bids or tenders therefor at less than par, the trustees shall thereupon draw by lot a sufficient number of debentures of the first series then outstanding, to absorb such deposits, and shall apply such deposits to the purchase of the debentures so drawn by lot at par. After purchase of the said debentures of the first series, the said sinking fund shall be applied in like manner, and by the same means, to the purchase of each other of the said several series of debentures in succession.

Sec. 26. The assignees and attorneys acting under this instrument are hereby invested with full power and authority to execute the provisions of this plant; to supply any and every defect in any and every case which is unprovided for in its terms, and to do anything and everything that is proper in their judgment to carry out its provisions.

In pursuance of the agreement thus entered into, the debentures were issued, and provision for their payment and security made, as shown in exhibit C, to the bill. The form of the debenture is as follows: "This is to certify that————————, is entitled to the sum of————— dollars, out of the sinking fund created by the Mobile & Ohio Railroad Company for the benefit of the holders of the several series of preferred income and sinking fund debentures issued by it, which sinking fund is created by and described in the deed of trust made by the said Railroad Company to the Farmers Loan and Trust Company, bearing date the first day of May, 1879. The said sinking fund consists of the proceeds of the lands described in the said trust deed, and of the surplus income so far as directed by said deed of trust, which proceeds and surplus income are to be applied to the purchase of the said preferred income and

[Mobile and Onio R. R. Co. v. Nicholas, et al.]

sinking fund debentures in the order of their priority and in the manner directed by the said deed of trust.

"This debenture issued pursuant to the terms of certain agreements heretofore made by the said Railroad Company for the compromise, extension and forbearance of its former indebtedness, and it does not bear interest at any fixed annual rate; but whenever it shall be ascertained that the net earnings or income of any one year amount to one per cent. or a multiple of one per cent. upon the principal amount of debentures embraced in any one series of debentures, after providing for prior charges on the gross earnings, such net earnings or net income for that year are to be applied, pursuant to the terms of said trust deed, to the payment of interest on such series of debentures, no one payment of interest to exceed seven per cent. on the principal amount of such debentures; and the Board of Directors of said Railroad Company, in whose election the debenture holders participate, as provided in said trust deed, are to determine the amount of such net earnings or income so applicable to the payment of interest.

"The registered holder of this debenture is entitled at the meetings of the holders of said debentures to be held pursuant to the terms and provisions of said trust deed, to cast one vote for each one hundred dollars of principal money herein expressed upon the question of instructing the trustee named in said trust deed and its successors, how to vote for directors of the Mobile & Ohio Railroad Company, and the holder of this debenture is also entitled to cast a like vote at all other meetings of said debenture holders called pursuant to the terms of the said trust deed, for any purpose of which said debenture holders may properly and lawfully be convened. This debenture is transferable only upon the books of the said The Mobile & Ohio Railroad Company at the City of New York, in person or by attorney, upon the surrender of this certificate, or upon a simultaneous endorsement hereon and under such regulations as the Board of Directors of said Railroad Company may, from time to time prescribe.

"In witness whereof, the said The Mobile & Ohio Railroad Company has hereunto set its corporate seal and caused these presents to be attested by its officers thereunto duly authorized, this day of————————18—.

(L. S.)　　　　　　　　　　　　　　　　　President.

　　　　　　　　　　　　　　　　　　　　　Secretary.

Countersigned and registered.

　　　　　　　　　　　　　　　　　　　　Trustee."

And to further carry out said agreement, and to secure the payment of the debentures, among other provisions it was agreed, that, Whereas, The said William H. Hays and T. Haskins Du Puy have, pursuant to the terms of the agreement of October 1, 1876, designated the Farmers Loan and Trust Company of the City of New York, to be the trustee in this Trust deed :

Now this indenture witnesseth that the said The Mobile and Ohio Railroad Company, in consideration of the premises and of the sum of one dollar to it in hand paid by the said party to the fourth part, at or before the sealing and delivery of these presents, the receipt whereof is hereby acknowledged, and for the purpose of carrying into effect the said compromises and agreements, as well as for the purpose of securing the payment of the amounts of money expressed in or payable upon the said debentures, and by and with the consent of said parties of the second and third parts, testified by their execution of these presents, hath granted, bargained and sold, assigned, transferred, conveyed and set over, and by these presents, doth grant, bargain and sell, assign, transfer, convey, and set over, unto the said, The Farmer's Loan & Trust Company, party of the fourth part to these presents.

To Have and To Hold the same, and the appurtenances, to the said party of the fourth part to these presents, and its successors in the said trusts, to, for and upon the uses, trusts and purposes hereinafter declared of and concerning the same, that is to say, in trust for the purpose of securing the performance of the conditions of said agreement of October 1, 1876, and the performance of the covenants therein contained for the benefit and security of the holders of the said debentures, and for the purpose of securing the payment of such sums of money as are expressed in or shall become payable upon the said debentures.   And it is hereby agreed that there shall be, and there is hereby created, pursuant to the terms of said agreement of October 1, 1876, a sinking fund for the benefit of the holders of the said debentures, that is to say, the said party of the fourth part and its successors, in the said trusts are hereby authorized from time to time to sell and convey the lands and premises hereby granted and conveyed and good and sufficient deeds therefor in fee simple to execute and deliver and to receive the proceeds of such sales; and said party of the fourth part and its successors in said trust shall deposit the proceeds of the sales of said lands in the Bank of the State of

New York, in the city of New York, or such other depository as the party of the fourth part or its successors in said trust may select in the City of New York, each six months ; and when ever and in case that the sums so deposited shall amount in the aggregate to ten thousand dollars or more, they shall advertise in the Cities of Mobile and New York, stating the amount so deposited at the disposal of the sinking fund, and asking for tenders of the debentures of the first series herein mentioned, then outstanding, awarding the amount so deposited to the holders of the debentures tendered at the lowest prices. In default of any bids or tenders of such debentures, the trustees shall thereupon draw, by lot, a sufficient number of the debentures of the first series then outstanding to absorb such deposits and shall apply the proceeds to the purchase of the debentures so drawn by lot, at par ; and after purchase of such debentures of the first series, the proceeds of the sales of said lands, and the interest received by said trustees, shall be applied in like manner, and by the same means, to the purchase of each of the said series of debentures in succession.

All debentures purchased by said party of the fourth part and its successors in the said trusts under this instrument, shall be transferred to the name of the trustee, and shall be stamped "Not negotiable," and shall not be reissued. And the said sinking fund is to consist of the proceeds of said lands, and of interest upon the debentures so purchased by the said party of the fourth part and its successors in said trust, until all the debentures shall have been bought, satisfied or extinguished; and there shall also be paid into the said sinking fund by the said the Mobile & Ohio Railroad Company a further amount equal to the amount of each dividend which may be hereafter declared upon the capital stock now existing or which may hereafter be created by said Railroad Company, which dividend shall not be declared or paid except an amount equal thereto is also paid at the same time of the net revenue into the sinking fund.

And, whereas, the said Hays and DuPuy, as holders of a number of shares of the capital stock of the said Railroad Company, have, by an instrument bearing even date herewith, made for the further security of the holders of said debentures, conveyed to and vested in the said party of the fourth part, and its successors in the said trust, power and authority, irrevocable while any of said debentures remain outstanding to represent and vote upon said shares of stock at all meetings of the stockholders of said Railroad Com-

[Mobile and Ohio R. R. Co. v. Nicholas, et al.]

pany for the election of directors, or for any other purpose, for which said stockholders may be lawfully convened. Now, therefore, · · · · · ·

And the said party of the fourth part and its successors in the said trust, as holders of said power and authority may and shall vote in person or by proxy, at stockholders' meetings of said Railroad Company, as instructed and directed by a majority of the votes cast at such annual meetings of said debenture holders, and for the purpose of identifying and registering the names of the debenture holders entitled to vote at said meetings, the transfer books for such debentures may and shall be closed at the same time and for the same period at and for which the stock transfer books of said Railroad Company shall be, pursuant to its by-laws, closed, so that no transfer of any of said debentures, nor of any of said stock shall be permitted within a period of not less than twenty days next preceding any meeting of said stockholders.

In further pursuance of said agreement, the committee of reorganization, executed to the Farmers' Loan & Trust Co., a power of attorney, a copy of which is made Exhibit "D" to the bill, and which after setting out the authority under which the power is executed, proceeds as follows: "Now, know ye, that we, the said William H. Hays and T. Haskins DuPuy, as survivors aforesaid, for and in consideration of the premises and of the sum of one dollar to us in hand paid by the said the Farmers' Loan & Trust Company, the receipt whereof is hereby acknowledged, and for the better security of the holders of the said debentures, and in pursuance and in consummation of said agreements, while retaining for ourselves and our assigns, holders of the said shares of stock and the respective parcels into which the same may hereafter be subdivided, all other rights and privileges which pertain to the ownership of said stock, have nominated, constituted and appointed, and in our place and stead, put and deputed, and by these presents do nominate, constitute and appoint, and in our place and stead put and depute the said the Farmers' Loan & Trust Company, and its successors in the trust created by the said trust, and for us and in our names, and in the name of our assigns, holders of said shares, or of any of the several parcels into which they may be hereafter subdivided, or lawfully otherwise (irrevocable while any of the said debentures are outstanding) to vote, pursuant to the charter and by-laws of the said company and lawfully otherwise and as fully to all intents and purposes as we ourselves or our assigns while holders

of said shares or any of them, could vote at any meeting of the stockholders of said corporation which may hereafter be called; and that as fully to all intents and purposes as the holders of said shares and the respective particles thereof could do if these presents had not been executed with full power of appointing substitutes and proxies and revoking such appointments and making new ones. And we hereby covenant and agree for ourselves and our assigns, holders of the said shares of stock or any thereof that so long as any of the said debentures be outstanding neither we nor our successors, nor any of our assigns, holders of the said shares of stock, shall or will withdraw the power and authority hereby given, nor undertake to exercise the privilege of voting upon said shares of stock, or any or either thereof, without the consent of our said attorneys, hereby constituted, and we hereby ratify and confirm all that our said attorneys and their substitute or substitutes, proxy or proxies, lawfully appointed, shall lawfully do by virtue thereof.

The form of assignment of the stock by the stockholder to the committee of reorganization, and the form of the certificate of stock issued to the stockholder, after the execution of the power of attorney to the Trust Company, are not made exhibits to the original bill, but are referred to in it. Both were before the chancellor and were proper matters for consideration. We here give both; first, the form of the assignment by the stockholder, and then the certificate of stock issued to him by the committee of reorganization.

"Mobile & Ohio Railroad Company.

No. ——    ..............................Shares.

This is to certify that —————— has assigned to the Committee of Reorganization of the Mobile & Ohio Railroad Company as created under the Memorandum of Agreement and Transfer, made the first day of October, 1876, between the said Mobile & Ohio Railroad Company, and the creditors of said corporation subscribing thereto, their successors and assigns —————— shares in the capital stock of said "Mobile & Ohio Railroad Company" of the nominal par value of One Hundred Dollars to each share, hereto standing in his name."

This assignment is made and received to enable the said "Committee of Reorganization" and its successors, to carry into effect the reorganization of said corporation, set out in said "Memorandum of Agreement and Transfer" and particularly stated in the 14th item thereof, so that said assignees, their successors and assigns, may vote said stock at all meetings of said corporations, as the agents and proxies

[Mobile and Ohio R. R. Co. v. Nicholas, et al.]

irrevocable of the said assignors, as fully as if the same were still held by him but for the uses and purposes declared in said memorandum and until the same are fully accomplished, but with this trust: that as to any and all income, dividend and profit to which said shares may become entitled, from the earnings and business of said corporation, the same shall belong to and be paid to the said —————— , the assignor or the holder of this certificate, which is by agreement declared to be transferable and deliverable to any holder by endorsement thereon, without entry in any book, and shall be taken to represent the shares of capital stock herein described.

Witness our hands at ——— this —— day of ——, 18—.

Copy of certificate of stock received by the shareholder.

"Be it known that ——— —— entitled to ——— shares of the capital stock of the Mobile & Ohio Railroad Company, One Hundred Dollars per share having been paid on the same, said shares being transferable on the books of the company only by the above named —————— in person or by attorney upon the surrender of this certificate and subject to the power of attorney herein referred to.

It is understood and declared that the ownership by the said —————— and his assigns of the said shares of stock entitles them to all the rights and privileges which pertain to the ownership of the said shares, including the right to such dividends and profits as shall be ascertained and declared upon the capital stock of the said company, saving and excepting that such ownership is subject to a power and authority heretofore granted by the owners of said shares to the Farmers' Loan & Trust Company in trust for the benefit and security of the preferred Income and Sinking Fund Debentures issued by said Railroad Company, by virtue of which power and authority the said the Farmers' Loan & Trust Company is and its successors will be entitled, in person or by proxy, to vote upon the said shares of stock at all meetings of the stockholders of the said company which may be hereafter for any purpose convened during the continuance of said trust, and so to vote in the name of either the present or future holders of said shares, or in the name of the said the Farmers' Loan & Trust Company, or its successors or proxies.

In witness whereof the signature of the president and the counter signature of the secretary and the seal of said company are herewith affixed this —— day of —— 18—.

Under the foregoing compromise and adjustment, all the creditors except those secured by the first mortgage bonds,

accepted the debentures provided for, in lieu of their former evidence of debt, and the claims and the foreclosure decrees, were assigned to the Farmers Trust Company, the receiver under the orders of the court, turned the property over to the railroad company, and the corporation resumed its control, and management of its property and business. A complete compromise and adjustment was effected. Everything seems to have been satisfactorily conducted to all parties under the adjustment plan until some time during the year 1887. The railroad company needed funds, and the debenture holders became dissatisfied and desired other arrangements in regard to their holdings. The result was the appointment of a committee, the submission of a plan—and the adoption of another agreement, which provided for the issue of ten millions five hundred thousand dollars of four per cent. bonds, secured by a general mortgage. These bonds are denominated general mortgage bonds. The agreement for the issue of the four per cent. bonds, among others, contains the following provisions:

## "EXHIBIT F."

III. The said general mortgage in conformity with the plan approved and adopted by the debenture holders, to provide: 1st. That in cases the earnings of the company or the amounts applicable to the payment of interest upon the general mortgage bonds, by virtue of the deed of trust creating said mortgage, shall for any period during the first three years or prior to the first day of September, 1891, be insufficient to pay in cash the interest due on the bonds issued thereunder, then, that the said interest may, at the option of the company, be paid in script, convertible in sums of five hundred dollars into the new general mortgage bonds and providing further that, after the expiration of. the said three years, the mortgage shall not be enforced by reason of a failure to pay interest until there shall be four successive coupons, or payments in default: 2nd. That the lien of the debentures deposited with the trustees of the new mortgage shall be maintained for the security and benefit of the bonds issued under said new mortgage.

3rd. That the sinking fund under the debenture deed of trust shall be continued and maintained until all of the debentures not held in the sinking fund shall be deposited with the trustees of the general mortgage, when and in which event the debentures held by the sinking fund shall upon the order of the company, be cancelled, and the funds deposited with the trustees of said sinking fund shall, in

that case, thereafter and in like manner, be applied to the purchase of the new four per cent. bonds, the same as so purchased to be cancelled.

4th. That in case the holders of the new bonds issued under the general mortgage shall desire to dispose of their holdings to the trustees of the sinking fund who may ask for tenders of debentures as provided in the debenture deed of trust, such holder may for that purpose obtain from the trustee of the general mortgage in exchange for the new bonds, dollar for dollar, the debentures called, for the purpose of delivering same to the trustees of the sinking fund, and in such an event, the trustee of the general mortgage shall cancel the bonds so exchanged for debentures.

The general mortgage bond has the following provisions : "This bond is one of a series of this date, numbered from one consecutively upwards, amounting in the aggregate to ten million five hundred thousand dollars, the payment of the principal and interest of which is equally secured by a certain mortgage or deed of trust dated May 15th, eighteen hundred and eighty-eight, duly executed and delivered by the said Mobile & Ohio Railroad Company to the Farmers Loan and Trust Company, of New York, as trustee and subject to the terms and conditions of which mortgage this bond is issued and held.

The registered holder of this bond is entitled, in accordance with the provisions of the said mortgage or deed of trust, to cast one vote for each five hundred dollars of principal herein expressed at all meetings of the holders hereof held pursuant to the deed of trust to instruct the trustee, or its successors, how to exercise the voting power therein conferred."

The mortgage, to secure the four per cent. bonds, and the agreement in reference thereto, after providing for the re-exchange of the general mortgage bonds for the debentures, in the seventh paragraph has the following provision : "7th. It is further mutually agreed that the preferred income and sinking fund debentures which may be deposited with the trustee hereof for exchange for the bonds secured by this indenture, upon the terms and in accordance with the plan adopted by the holders of the several classes of preferred income and sinking fund debentures at the meeting of February 24th, 1888, shall be held by the trustee hereunder for the security and benefit of the bonds, secured by this indenture, and that all the right, title and interest of the holders of those debentures so deposited shall be transferred and vested in the trustee of this indenture, by whom the same

Vol. 98.

shall thereafter be held for the security of the bonds issued hereunder. And it is expressly understood and agreed that the amount of interest collected by the trustee hereunder, upon the debentures so deposited with it for the purpose of exchange for bonds of the present issue, which shall amount to more than the sum necessary to pay the interest then due upon the bonds hereby represented, shall, after the payment of said interest, be delivered by the said trustee hereunder to the company. It is hereby further provided and expressly agreed that if at any time all of the debentures issued and outstanding under the deed of trust, dated May 1st, 1879, which are not held in the sinking fund provided for in the said deed of trust, shall at any time become or be deposited with the trustee of this mortgage, then and in that event the trustee hereunder shall be considered to have become subrogated to the rights, privileges and position of the holders of all of the said debentures, and the debentures held by the sinking fund shall, in that event, upon the order of the company, be cancelled, and the funds deposited with the trustees of the sinking fund provided for in the trust deed of May 1st, 1879, shall thereafter, in that case and in like manner as is provided for in said trust deed, be appropriated to the purchase of the bonds hereby secured, and in case of the purchase of any of said last mentioned bonds in the manner last provided for, the same shall thereupon be cancelled. At any time however, prior to the time when all of the preferred income and sinking fund debentures shall have been deposited with the trustees of this mortgage for exchange for the bonds secured hereby, as herein and in said plan adopted February 24, 1888, provided, it is hereby expressly understood and agreed that the holders of any of the bonds issued under this mortgage shall have the right, if they so desire, to dispose of their holdings to the trustees of the sinking fund provided for in the trust deed of May 1st, 1879, who may ask for tenders of debentures as provided in said deed, and in that case each such holder may for that purpose obtain from the trustees hereof, in exchange for the bonds secured hereby, dollar for dollar, the debentures called for, for the purpose of delivering the same to the trustees of the sinking fund, and in such event the trustee hereof shall cancel the bonds so exchanged for debentures.

It is hereby further expressly agreed that there shall be a meeting of the holders of the bonds secured hereby, immediately prior to every meeting of the holders of the preferred income and sinking fund debentures, which may be

called under and in accordance with the terms of said deed of trust of May 1st, 1879, and that such meetings shall be called by the company in the same manner and upon like notice as the meetings called of the debenture holders provided for in the said deed of trust of May 1st, 1879, that such meetings shall be regulated in procedure by the by-laws of the company, and shall be for the purpose of directing the trustee of this mortgage how to vote upon all of the debentures which have been deposited with it in exchange for bonds secured hereby, at the meetings of the debenture holders called in accordance with the provisions of the deed of trust of May 1st, 1879.

At all meetings of the holders of the bonds secured hereby, each bond shall entitle the person or persons whose name appears upon the "Voting Register" as hereinafter provided to one vote for each $500 of principal money secured hereby.

Under this latter arrangement, reported on 24th February, 1888, and fully consummated in May, 1888, all the debentures issued under the agreement of 1876, which had not been absorbed or taken up by the sinking fund, except sixty-four thousand dollars of debentures, were surrendered to the trustee, and the holders thereof received in lieu four per cent. bonds, as provided in the adjustment of 1888. So far as we are informed by the pleadings, there seems to have been no objection to the execution of the general mortgage, and the issue of the four per cent. bonds, until February, 1892, when complainants denied the authority of the Trust Company, under the power of attorney held by it to vote their stock, and claimed for themselves the right to vote their own stock. Complainants to further fortify themselves in the right thus set up, tendered to the railroad company, and also to the Trust Company, sixty-four thousand dollars, with instructions to pay off the sixty-four thousand outstanding debentures, which had not been surrendered for the four per cent. bond issue under the agreement of May, 888. The tender was refused, and the right of complainants to vote at the stockholders meeting, denied. Thereupon the complainants filed the present bill. The pleadings are very voluminous, and we have stated the main facts at considerable length. We deemed this necessary for a proper understanding of the material questions to be decided, and the application of legal principles.

The prayer of the bill is as follows : "Orator prays your honor, that the said Mobile and Ohio Railroad Company, the said Farmers' Loan and Trust Company, and the said William B. Duncan, may be made parties defendant hereto

by proper subpœnas, or by other proper process, requiring them to answer, plead or demur to this bill of complaint, as provided by law.

Orator further prays your honor to grant a preliminary injunction enjoining and restraining the said Mobile and Ohio Railroad Company, its officers and inspectors of election from refusing to accept the votes of orator and the other stockholders hereinbefore named in paragraph four of this bill, at the election to be held at said stockholders meeting, on the 17th day of February, 1892. And that they be further enjoined and restrained from suffering or permitting the said Farmers' Loan and Trust Company to vote the said stock which the said company claims to represent, under the said powers of attorney executed to it from the 9th day of September, 1889, to the 10th day of November, 1881, both inclusive, by the said Hays and DuPuy; and further, that the said Farmers' Loan and Trust Company, its agents and attorneys, be enjoined from casting the vote of said stock, and upon the hearing orator prays your honor to decree that all of said debenture holders who have not heretofore exchanged their debentures for such four per cent. bonds, or who have not been heretofore paid their said debentures, be required, within a period to be fixed by your honor, to file the same in the registry of this court, for payment; orator hereby offers to pay into the registry of this court, upon the order of your honor, an amount sufficient to pay and discharge the said debentures which have not been exchanged or paid as aforesaid, in full.

Orator further prays your honor, that the said debentures may be cancelled and annulled, and the deed of trust made to secure the same delivered up and cancelled. Orator further prays your honor upon such hearing, to make said injunction perpetual, and should orator be mistaken in the relief to which he is entitled, he prays your honor for all such other and further relief as may seem to your honor meet and equitable in the premises, and in duty bound he will ever pray."

The bill was marked filed by the register of the Chancery Court, on the 12th of February, the order for an injunction was granted by the judge of the City Court of Montgomery, without notice to the other side, on the 13th of February, and the writ issued by the register on the 15th day of February, 1892, and executed on some of the defendants the same day, two days before the day appointed for the meeting of the stockholders, for the purpose of an election of directors. On the 16th of February, the judge who granted

the injunction, modified his order. The original writ of injunction issued in accordance with the prayer of the bill, by which the defendants were enjoined from refusing to accept the votes of the complainant, John S. Nicholas, and other named stockholders, and enjoined them not to permit the Trust Company from voting the stock under the power of attorney held by it. The order modifying the original writ of injunction in effect, simply postponed the election appointed for the 17th. of February, 1892, and prohibited the meeting of the stockholders called to meet on that day, and until the further orders of the Chancery Court of Mobile county.

The point is raised by complainants, that the city judge had no authority to modify the order granting the injunction. The respondents moved to dismiss the bill for want of equity, to dissolve the injunction; and demurred to the bill, assigning various grounds of demurrer. They also filed a cross-bill. The chancellor overruled the motions in regard to the original bill, and dismissed the cross-bill. From these decrees the appeal is prosecuted to this court. The facts stated in the bill show, that by the re-organizatian and compromise of 1876, perfected in 1879, the voting power was severed from the stockholder, and until the payment of the debentures, irrevocably vested in the Farmers' Trust Company and the debenture holders. It is contended for complainants that the agreement was, and "is void *per se*," because 1st: "It contravenes the language of the charter of the railroad company; and 2nd, because it is against public policy."

The charter expressly provides, "Each share shall entitle the holder thereof to one vote, which vote may be given by said stockholder in person, or by lawful proxy."

So far, then, as the right to vote by proxy is questioned, the charter expressly grants the power, and the legislature has thus declared that it is not unlawful, *per se*, to separate the voting power from the stockholder, so far as the appointment of a proxy may be considered a severance of the voting power. Where a proxy is duly constituted, and the power of the appointment is without limitation, a vote cast by the proxy binds the stockholder, whether exercised in behalf of his interest or not, to the same extent as if the vote had been cast by the stockholder in person. We do not hold that a power of attorney, absolute in its terms, will authorize the agent or proxy, to effect contracts, or legalize acts, outside of the scope of his authority, or contrary to law or public policy, neither could the stockholder in per-

son by his vote effectuate such a result. The invalidity of acts of this character by a proxy, rightly understood, is not made to rest upon the ground, that there has been a separation of the voting power from the stockholders, but because of the unlawful purpose for which the proxy was appointed, or the unlawful end, attempted to be effected by the exercise of the voting power. The distinction should be kept in view. Take the case of the *Richmond & Danville Extension Company v. The Woodstock Iron Co.*, 129 U. S. 643, cited by complainant. The Woodstock Iron Co. agreed to pay thirty thousand dollars, if the Georgia Pacific Railroad was run through the town of Anniston, where the Woodstock Iron Co. owned a large plant, mines, and other property. The contract was held void as being against public policy. No question of the separation of the voting power from the shareholder, arose in the case. It was the character of the contract, the unlawful purpose in view, to build up the Woodstock Iron Co. at the expense of the stockholders of the railroad company that was condemned. The same principle applies to many other cases cited in which, it was held, "that contracts made to influence railroad companies in selecting their routes and erecting their depots and stations by donations in land and money to some of its directors and stockholders were invalid," citing *Bestor v. Wathen*, 60 Ill. 131; *Linden v. Carpenter*, 62 Ill. 307.

· Take the case of *Hafer v. N. Y., Lake Erie & Western R. R. Co.*, 14 Weekly Law Bulletin, p. 68. The case is thus stated : "A controlling interest in the stock of the Cincinnati, Hamilton and Dayton Railroad Company was bought up in 1882, and placed in the name of H. I. Jewett, who ,was Vice-President of the New York, Lake Erie and Western Railway Co., under the agreement that he should give irrevocable proxy to such persons as the Erie should appoint to vote on the stock ; that his stock certificates should be left in the hands of trustees, and that they should issue to the respective owners of the stock trust, or pool certificates for amounts equal to their respective equitable interest. On all stock thus pooled, the Erie agreed to guarantee a certain dividend."

The court declared the contract void "both on the ground that the power is denied to one corporation thus to acquire control of another, and that the stockholder can not barter away the right to vote upon his stock." True the opinion declares as an independent proposition, "that the stockholder can not barter away the right to vote upon his stock," and yet it is shown, by the facts of the case and the opinion, that

the purpose to be effected by the barter of the right to vote, to-wit, the placing "of an Ohio corporation into the hands of a New York corporation," the enabling "one corporation to acquire control over another" was illegal. Speaking of the facts of the case the opinion proceeds as follows: "It is obvious that the rule as to executed contracts can not be applied to the plaintiff for any such reason as that last mentioned, *for he was not a party to the contract.* There are other cases wherein special circumstances made it imperative, as a matter of good faith, that the contract should not be interfered with, and others, when the protection of interest acquired by innocent parties caused the court to refrain." There is no rule of law which requires contracts to be upheld which are void as against public policy, in order to preserve "good faith" or "innocent parties." The rule of estoppel is often applied to prevent undue advantage by one person over another, but the rule does not extend to contracts which are void because contravening public policy. Considering the opinion as an entirety, we do not regard it as authority to the proposition, that an agreement which provides for a separation of the right to vote from the holder of the stock is "*per se,*" at all times and under all circumstances contrary to public policy and void. We have examined case after case and find generally that the agreements declared void by the courts, where the power to vote was separated from the stockholder and vested in third persons, were under circumstances which showed that the purpose to be accomplished was unlawful, such as the courts would not sanction if the principal had voted and not a proxy; and in cases of a mere dry trust, it is held that the stockholder might revoke a power of attorney in form irrevocable. The doctrine as to dry trust does not arise in this case.

Certainly the case of *Griffith v. Jewett,* 15 Weekly Law Bulletin, 419, or of *Moses v. Scott,* 84 Ala. 608, do not sustain complainants' contention in this respect. If there were no precedents, upon principle, we would hold that in determining the validity of an agreement, which provides for the vesting of the voting power in a person other than the stockholder, regard should be had to the condition of the parties, the purpose to be accomplished, the consideration of the undertaking, interest which have been surrendered, rights acquired, and the consequences to result. The law does not make contracts for parties, neither will it annul them except to preserve its own majesty, and to conserve the greater interest of the public. Let us examine the con-

ditions of the parties, the purpose in view and effect of the agreement of 1876, consummated in 1879, the consideration and interest surrendered and rights acquired by the re-adjustment, and issue of the debentures, the position of the complainants thereto, and the results of holding that reorganization, *per se,* void.

The complainants belong to the class known as "Assenting Stockholders." They surrendered their stock to the committee of reorganization in order that the power of attorney, executed to the trust company by the committee of reorganization, might be executed, and that the debentures should be issued to the creditors of the railroad corporation. The certificates of stock held by them show, upon their face, that they are subject to the power of attorney and to the rights of the debenture-holders. At the time the plan of adjustment was agreed upon the railroad company was in the hands of a receiver. Decrees of foreclosure rendered against the company. The indebtedness far exceeded the value of the railroad company's property. The execution of the decrees of foreclosure, by a sale of the property, and the prosecutions of the admitted claims against the railroad company, would necessarily have transferred the property to other parties and wiped out every vestige of present available interest or right of the stockholder, or hope of future profit. The creditors held the vantage ground, and in law their rights and interest were paramount to the stockholders. The latter might accept propositions but were in no position to dictate terms. These were the circumstances under which the settlement and agreement was made. Stated in short, the compromise and settlement led to the issue of the debentures to the creditors in lieu of their original evidences of debt, and a mortgage upon certain property to secure them, a plan for a sinking fund for their benefit, and the right and privilege under an irrevocable power of attorney to vote the stock *until the debentures were paid.* The power of attorney was not in perpetuity, or absolute, but only until the debentures were paid, and a fair construction under the circumstances required that the voting power should be used fairly and honestly to this end, or as stated in the agreement itself, "for the uses and purposes declared in said memorandum, and until the same are fully accomplished." In consideration therefor.the decrees of foreclosure at first suspended, were transferred to the trust company, creditors surrendered their claims and accepted in lieu thereof the debentures, the receiver under the orders of the court restored the property to the Mobile &

Ohio Railroad Co., which resumed management and control of its property and affairs, and the stock preserved to the stockholder.

To this agreement over forty-five thousand out of a total of about fifty-three thousand of shares of stock assented, and among those which assented were complainants. The creditors had the right to accept debentures for their debts. The agreement continued in existence the corporation and preserved to the stockholders their stock. It did not violate the charter of the railroad corporation. The purpose was legal, the means used did not contravene any statute of the State or principle of public policy, and was within the scope of the power of the contracting parties. Good faith on the part of the assenting stockholders, whose interest were thus preserved, and to those who accepted the debentures in lieu of other evidences of debt and securities, and to those who have since purchased them upon the faith of the plan of compromise demand that the terms of the contract be fulfilled. Tested by any principle of law, legal or equitable, the agreement was not only valid but fair at least to the corporation company and stockholders.

The next question for consideration arises upon the agreement made in 1887–8, under which 10,500,000 bonds were issued and a general mortgage executed to secure them.

The averments of the bill show that all the debentures not absorbed by the sinking fund, except 64,000, were surrendered and general mortgage bonds accepted in lieu of them. It is contended by complainants that the acceptance of these general mortgage bonds, extinguished, *pro tanto*, the debentures issued under the settlement of 1876 and 1879, and as there were left only 64,000 of the debentures not exchanged for the bonds, complainants had the right to pay off and extinguish the 64,000 outstanding debentures, and thereby, under the original agreement, become reinvested with the voting power conveyed for the benefit of the debenture holders. The correctness of the conclusion, by the agreement, is made to rest upon the soundness of the premises. Did the acceptance of the bonds and the surrender of the debentures, in law under the conditions operate an extinguishment of the debentures? The bonds exchanged for debentures, in a different form, and with some additional and different securities, represented the same debt as the debentures for which they were exchanged. Whether therefore the debentures were extinguished by the acceptance of the bonds, depends entirely upon the intention of the par-

[Mobile and Ohio R. R. Co. v. Nicholas, et al.]

ties as manifested by the agreement itself, the stipulations of the bonds and provision of the general mortgage.

These have been sufficiently stated in another part of this opinion, and need not be here repeated at length. Can any fair construction be placed upon the written evidence, of the intention of the parties, so carefully and fully expressed, in the agreement, the bonds, and the mortgage, which would justify the conclusion that it was understood and intended by the parties that the surrender of the debenture and the acceptance of the four per cent. bonds was intended to effect a payment or extinguishment of the debenture? It would have been a very easy and simple matter to have inserted a provision to this effect in the contract. Instead of doing this, the contracting parties stipulated 2nd "that the lien of the debentures deposited with the trustee of the new mortgage shall be maintained for the security and benefit of the bonds issued under said new mortgage." 3rd. "That the sinking fund under the debenture deed of trust shall be continued and maintained until all the debentures not held by the sinking fund, shall be deposited with the trustee of the general mortgage," &c. 4th. "That in case the holders of the new bonds issued under the general mortgage shall desire to dispose of their holdings to the trustees of the sinking fund, who may ask for tenders of debentures as provided in the debenture deed of trust, such holder may for that purpose obtain from the trustee of the general mortgage in exchange for the new bonds dollar for dollar, the debentures called." The 7th paragraph of the general mortgage which has been fully stated, is particularly referred to in this connection, and other provisions might be cited, but it is clear, that these could not be carried out, if the acceptance of the bond operated an extinguishment of the debentures.

The case of *Billingsley v. Harrell*, 11 Ala. 777, cited by complainants, is wholly unlike the present. In that case there was no reference in the second mortgage to the first mortgage and in the statement of facts, it is said "at the time of the execution of this deed there was no understanding or agreement between the parties as to what was to be its effect on the bill of sale (which was a mortgage) previously made to Becton." By the express terms of the agreement and mortgage in the case at bar, the debentures and the provisions and securities for their payment, were to be kept alive. Had these four per cent. bonds been issued and secured by a general mortgage of the property of the railroad corporation and simply provided for their exchange for the debentures, surrendered in lieu thereof,

the doctrine of novation or payment of the debentures might be urged with more plausibility and force. We know of no decision or text, which has ever declared that the doctrine of novation applied, or that a previous contract of indebtedness was extinguished by a subsequent contract, when by the terms of the latter and as a part of its consideration, the former with its securities were to be kept alive and continued in force for the "security and benefit" of the latter, there being no question of suretyship involved. To apply these principles in the face of the carefully guarded provision for keeping the debentures alive, the preservation of the feeders to the sinking fund, and securing to the bondholder, the privilege to exchange his bond for the debenture, thus preserved, would be to apply principles of law and an effect, not authorized by the agreement, and at variance with the intention of the parties so clearly and unmistakably and carefully expressed and provided in the agreement itself. *Lee v. Green*, 83 Ala. 492-3; *Keel v. Larkin*, 72 Ala. 500; *McDonnell v. Gold Life Ins. Co.*, 85 Ala. 401.

The bill of complaint does not seek to annul and cancel the four per cent. bonds. It declares that they are valid. The whole argument in reference to the extinguishment of the debentures and the right to tender payment of the 64,000 outstanding debentures, rest upon the validity of these bonds. We simply declare that the issue of the bonds and their acceptance by the debenture holders, under the conditions and terms specified did not effect an extinguishment of the debentures. If the bill had charged that the proxy of the stockholders, held by the trust company, and the power of the debenture holders, to vote had been used for other purposes, than that authorized by the power of attorney and agreement made in 1879, in the issuance of the four per cent. bonds, and execution of the general mortgage and in the authority granted to the holders of these bonds to vote, and had prayed for a cancellation of the four per cent. bonds, and the mortgage to secure them, a different case and different questions would arise. Whether there was an abuse of the trust, or the authority granted, was exceeded in the issue of the general mortgage bond, and if so whether there had been a ratification of such acquiescence or laches on the part of complainants as to estop them from seeking relief from the obligations entered into for their issue and security, are not raised by the demurrer to the bill, and are not necessarily involved in the questions upon which complainants seek relief. These questions have been discussed by some of the counsel at length, but as their de-

cision is not necessary, we express no opinion upon them. Any decision affecting the validity of the four per cent. general mortgage bonds would not lead to a different conclusion. If declared null and void, as having been issued without proper authority, such a decision necessarily asserts the non-extinguishment of the debentures. A void obligation can not pay or extinguish a valid obligation, or in any sense be accepted as a novation of a previous valid agreement. If the bonds should be declared valid, either as having been legally issued, or as having become obligatory by ratification or acquiescence, or should be upheld upon principles of equitable estoppel, we have seen that the debentures, and sinking fund were expressly kept alive and enforceable for the "benefit and security" of the general mortgage bonds.

It is contended in the next place that the agreement by which the stockholder parted with his voting power, created the relation of surety and creditor between the stockholder and debenture holder, and "that the voting trust has been terminated by the extension and enlargement of the debt, and by the substantial modification of the terms upon which the voting franchise was to be exercised."

Many authorities have been cited to sustain the proposition, that any extension of the time of payment by the creditor and principal debtor, or material modification of the contract, without the assent of the surety, will release the surety and this without regard to the fact, as to whether the extension, or modification was to the benefit or injury of the surety. Authorities have also been cited, to the effect, that property pledged or conveyed by a third person as security for a debt, would be released, by any agreement between the debtor and creditor which would release a surety. We think these propositions undeniably correct. The difficulty lies in sustaining the premise for the argument. Did the agreement of 1876 and 1879, and the execution of the power of attorney by the stockholders to the reorganization committee constitute the stockholders sureties for the railroad company, the corporation in which they held their stock? or was the "voting power," vested in the trust company, property in such sort, as that a modication of the contract of 1876 and 1879, discharged and released it, so that it became re-invested in the stockholder? Can a stockholder as such, not as an individual, but as a stockholder, purely, become a surety for the debt of the corporation? What property has a stockholder as such, of money value, that is not liable for the debts of the corporation? The capital stock of the corporation, the fountain

[Mobile and Ohio R. R. Co. v. Nicholas, et al.]

of life to the shareholder, is a fund specially set apart by law for creditors. Neither the capital stock, nor any asset of the corporation could be pledged as surety for the debt of the corporation; and we can not well see how the "voting power," the means provided by law, to control corporate affairs for the protection of these interests, can be pledged as a surety for a debt, for which these interests could not be pledged as surety.

For many purposes, and especially in a court of equity, for the protection of the stockholder, the corporate entity is distinct and separate from the stockholder. They may contract with each other, and the one may be sued by the other. But the stockholders and the corporation are not separate entities for all purposes. Morawetz says: "While a corporation may, from one point of view, be considered as an entity without regard to the corporators who compose it, the fact remains self evident that a corporation is not *in reality* a person or a thing distinct from its constituent parts. The word corporation is but a collective name for the corporators or members who compose an incorporated association; and where it is said that a corporation is itself a person, or being or creature, this must be understood in a figurative sense only."

*Ib.* § 227. "A clear perception of the real nature and constitution of an incorporated association is of the utmost importance in considering the rights and obligations of the individual shareholders, and their relation to the association as a body. It is especially necessary that the legal fiction by which a corporation is regarded as a person, or entity apart from its several members, be correctly understood and applied.

The statement that a corporation is an artificial person, or entity apart from its members, is merely a description in figurative language of a corporation viewed as a collective body; a corporation is really an association of persons, and no judicial *dictum* or legislative enactment can alter this fact."

The same author in § 879 uses this language: "It has sometimes been said, that the individual liability assumed by the shareholders of a corporation for the security of creditors, is that of guarantors or sureties of the corporation. Statements of this character must always be considered with reference to the particular subject-matter to which they are applied. It is a truth which no legislative act or judicial decision can alter, that a corporation consists of its shareholders, and that when shareholders become individually

[Mobile and Ohio R. R. Co. v. Nicholas, et al.]

liable for the debts of their corporation, they become individually liable for the debts which they themselves owe in a corporate capacity. This individual liability. may be, in some respects, similar to that of suretyship, but it is certain that the shareholders are not in fact sureties within the accepted meaning of that term. To hold that, because shareholders are called sureties within a special meaning of that term, their liability must be governed by the principles of ordinary suretyship, would clearly be illogical."

We have quoted from this author extensively, not only because his work on Private Corporations is entitled to great consideration, but we approve of his definition of a "corporation"—that "it is but a collective name for the corporators, or members who compose an incorporated association" —it "is really an association of persons." This definition kept clearly in view, will prevent confusion, and enable the courts to apply proper principles of law to transactions entered into by the corporation in its corporate name, by shareholders as such, and by the shareholder in his individual capacity, and to distinguish their respective liabilities. The charter defines the purposes of the corporation and prescribes its duties and powers, and those of the members of the association, or stockholders. The legislature may also impose upon each stockholder an individual liability in favor of the creditors of the corporation. The individual liability when thus imposed, has been held by some of the courts to be that of a surety, and any extension of time for its payment by the creditor, to operate a release of the individual liability of the stockholder. The weight of authority on this question seems to hold to the contrary. Many authorities for and against the proposition, are collected in the case of *Thompson v. Reeves*, 3 Am. St. Rep., notes, page 848–849. Taylor on Corporations, § 715, says : "That it is not the liability of guarantors, seems too evident to require argument. Suretyship is a legal institution, composed of peculiar rules, based on the general notion that a surety is a man conferring a benefit and receiving none in return." We have already quoted Morawetz, and criticising the doctrine that, time given to the corporation by its creditor would release the stockholder from individual liability imposed by the statute, this author says : "If the court had borne in mind that the indulgence given to the corporation was, in fact, given to the shareholders themselves, acting in a corporate capacity, through agents of their own appointment, a different conclusion would probably have been reached. In this sense, the debt of the corpora-

tion is the debt of the *"members* of the incorporated association." Acting collectively by their corporate name, they could not become surety for the corporate debt. It would be absurd to hold that acting separately, but still as members of the association, a different result would be effected. We are clearly of the opinion, that by the agreement and compromise of 1876 and 1879, the stockholders did not become bound as sureties for the Mobile & Ohio Railroad Company. We think another principle of law equally fatal to complainant's contention in this respect. A surety is one who "contracts to answer for the debt, default or miscarriage of another;" "an obligation accessorial to that of a principal debtor," but the relation of surety does not exist where the consideration moves directly to or from the person claiming the privilege of a surety. As Mr. Taylor says, *supra,* "The peculiar rules of suretyship are based on the general notion that a surety is a man conferring a benefit and receiving none in return." Who were the beneficiaries under the compromise and adjustment of 1876 and 1879, by which the foreclosure decrees were suspended and the property restored to the railroad company, and the stock preserved to the shareholder? Complainants contend that the Mobile & Ohio R. R. Co. was the debtor and beneficiary. But it is too clear for argument, that the benefit to the Mobile & Ohio Railroad Company was a direct and intended benefit for the members of the association incorporated by that name, and who were the stockholders, now claiming to be sureties. The stockholders were not only the immediate beneficiaries under the plan of compromise, but so far as the creditors demanded the surrender of the "voting power" the stockholders were principals to that agreement and the only parties who could make a valid agreement, to this effect. In so far as the vesting of the "voting power" in the Trust Company was an act, which the corporation in its corporate name could not do, but which could be done and was done, by the stockholders, it was for a consideration directly in the interest of the stockholders forming the association incorporated. In this respect and for this purpose (the benefit to be derived) the "members of the association" constituted the corporation, and acting for themselves and in their own several capacities as stockholders, they were necessarily principals to the agreement. At common-law, a stockholder was such an interested party in, or such a part of the corporation as to disqualify him from being a witness for the corporation. The question may be asked, if the stockholder can thus contract as principal, independent of the corpora-

tion, why can he not become surety for the corporation? If we keep in view the definition of a corporation adopted by us as being correct, the answer is plain. As a "member of the incorporated association," the debt of the corporation is his debt so far as he is a stockholder, and being such, he can not, as a stockholder, become its surety. As a stockholder (and not as an individual) he is invested with a "voting power," which he can use independent of the corporate body. The corporation in its corporate name holds property, which, under proper authority, it may mortgage or pledge to secure its debt. The making of the mortgage or pledge to secure its own debt, can not change its relation as principal debtor to that of surety. The stockholder in his corporate capacity and in this alone, holds a "voting power." As a stockholder he may surrender his voting power, upon proper consideration and for a proper purpose, to secure the debt of the corporation, which, as a member of the corporate association, is his debt. He does not thereby change his relation as principal debtor to that of surety, no more than the corporate body itself, by giving a mortgage. Of course these principles of law would have no application, if the stockholder acting in his individual capacity should mortgage or pledge his individual property, and not a corporate right or property held by him in his corporate capacity as stockholder.

All corporate rights and property of money value, the subject of contract, whether held in the name of the corporation, or by the shareholder, is liable, without a special contract to that effect, to the claims of creditors of the corporation, and no contract between the corporation, or stockholder, or corporation and stockholder on the one part, and a creditor of the corporation on the other part, by which such property or such right is pledged or transferred, to secure a debt of the corporation, can be regarded in law a contract of mere suretyship in the sense that a modification of the contract of indebtedness, will wholly release the pledge or transfer. In all such cases, there is that entity of parties and oneness or community of beneficial interest, of the corporation and stockholder, which excludes the relation of principal and surety, as to creditors of the corporation they are principals to such a contract. The agreement was simply this: To preserve his own property interest owned as a stockholder, from sale by the creditor of the corporation, the stockholder agreed that the creditor should manage and control the corporate affairs until the debt was paid. What ingredient of suretyship is there involved in such an

agreement? There is no undertaking by the stockholder to pay the debt, if a principal does not pay it. There is no pledge of property which is to be or may be subjected to the payment of the debt, if the principal fails to pay. These are necessary elements in every obligation of suretyship, and if wanting the contract can not be that of a surety. The object of the agreement was to preserve the interest of the stockholder. It moved directly to him. The relation of surety does not exist when the party contracting is the direct beneficiary and the contract is entered into by him for his own benefit. The creditor may be restrained from any unlawful use of property or privileges conveyed by the agreement, or held responsible for any damage or injury wrongfully sustained by the grantors, but the property or right pledged, or transferred, will not revert to the grantor, there being no provision in the agreement to that effect.

Our conclusion is, the original bill is without equity, and the injunction granted thereon ought to have been dissolved. Under this view of the case, it becomes unnecessary to determine whether the city judge had the power to modify the order granting the writ of injunction before it was executed and returned into the chancery court. The decree dissolving the injunction and dismissing the bill for want of equity will relate back and take effect so as to place the parties in *statu quo* before the bill was filed, as to any election held under the order granting the writ of injunction, or in violation of the order as modified by the city court judge. We deem it, therefore, unnecessary, to consider the questions presented in the cross bill.

Judges invested with the power to grant writs of injunction, should examine with great care the merits of the application, when a mandatory injunction or restraining order is applied for.

In the case at bar, two days before the election for directors, the voting power was taken from those who had been exercising this right for thirteen years, and without notice to them, was transferred to others, whose right to vote was denied, upon the averments of a bill, the very purpose of which was to determine the rights of the respective parties in this respect. In effect the case was predetermined, before a hearing and without notice. A decree will be here rendered dissolving the injunction granted upon the original bill, and dismissing the original bill for want of equity. A decree will also be rendered modifying the decree, dismiss-

[Atkins v. Tutwiler.]

ing the cross bill absolutely, so that the same shall stand dismissed but without prejudice.

Original bill reversed and rendered.

Cross bill modified and affirmed.